IN THE UNITED STATES BANKRUPTCY COURT

FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 02-30767-WRS |
| STEPHEN L. PRICE, | |
| Debtor. | CHAPTER 7 |
| SUSAN SHIROCK DEPAOLA, in her official capacity of Trustee for the bankruptcy estate of STEVEN L. PRICE, | ADVERSARY PROCEEDING |
| Plaintiff, | No. 05-03063 |
| v. | |
| STEVEN L. PRICE and STARLA WATSON PRICE FRAZER, | |
| Defendants, | |
| v. | |
| STEVEN L. PRICE, | |
| Cross-Claim Defendant, | |
| v. | |
| SUSAN S. DEPAOLA, TRUSTEE, and THOMAS BADDLEY, | |
| Third Party Defendants. | |

**TRUSTEE'S RESPONSE TO STARLA FRAZER'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

## I. SUMMARY AND OVERVIEW

Steven Price ("Price") filed a voluntary petition for an order of relief under Title 11, Chapter 11, March 11, 2002. A related company[1] filed a voluntary petition for relief under Chapter 11, November 9, 2001. Price was not in Chapter 11 very long and within approximately two months filed a motion to convert from Chapter 11 to Chapter 7. This motion was ordered granted, April 24, 2002. Susan S. DePaola ("Trustee") was appointed Interim Trustee, May 6, 2002.

During administration of Price's Chapter 7 case, Price or his counsel may have made general statements about his stock ownership in Tiffin Motor Homes, Inc. ("Tiffin"). In a letter dated October 14, 2002, Price represented to the Trustee that the stock had limited or nominal value and that Tiffin essentially prevailed in pending state court litigation. At no time did Price mention or suggest that the stock had been conveyed to Starla Price, now Starla Frazer ("Frazer"). Because of the referenced representations, investigation of the Trustee turned to furniture items and proceeds being held incident to the sale of the Colorado home.

Apparently, litigation had been filed in a Colorado state court and a prejudgment order restricted distribution of Frazer's share. Local counsel[2] for Frazer was discussing settlement with the Trustee and had essentially reached an agreement regarding a division of the sale proceeds held in a court in Colorado. However, it was later discovered that Frazer engaged substitute counsel in Montgomery and, with the help of counsel in the state of Colorado, negotiated a settlement with the Plaintiff creditor and this settlement ultimately allowed Frazer to receive the balance of the sale

---

[1] Cross Country Freightlines, Inc. ("Cross Country"), Bankruptcy Case Number 01-07131, Middle District of Alabama, converted to Chapter 7, April 23, 2002.
[2] For a period of time, the same attorney representing Price was either representing, or making offers of settlement for Frazer.

balance of the sale proceeds[3]. Upon the Trustee learning of the clandestine settlement, the Trustee elected to close the case as opposed to filing an adversary proceeding when the money had already been disbursed and the claimed insolvency by Frazer. The Trustee recommended that the case be closed as a no asset case, June 21, 2004.

The case remained closed until December 21, 2004 when the Trustee filed a motion to reopen. This action was prompted when the Trustee learned that Price has materially omitted and actively misrepresented important information regarding the Tiffin litigation and the value of his stock in Tiffin. Information that came to Trustee suggested a multimillion dollar recovery by the minority shareholders of Tiffin would result in a payment, over time, of over $1,000,000.00 to Price. It was further revealed to the Trustee that the Price's domestic relations case had also been reopened to take up this issue. Based upon this newly discovered information, the Trustee intervened and filed the motion to reopen the bankruptcy case.

Subsequent investigations revealed that Price misrepresented material facts during the pendency of his Chapter 7 case and apparently pursued the sale of his stock the date that the 341 was held in his Chapter 11 case and just months before his case was converted to Chapter 7. Also, a number of other material facts were either omitted or misrepresented. Discovery will yet develop the point in time that Debtor's trial counsel knew of bankruptcy and divorce. In 2004, the Debtor maintained, under oath his stock ownership. Finally, as late as January 2005, Price again gave his sworn affidavit regarding stock ownership.

---

[3] Discovery has not yet revealed how much money was received as sales proceeds and how much was ordered paid into the Colorado court under the pre judgment seizure and how much was ultimately distributed to Frazer. However, it is believed that the net sales proceeds exceeded $500,000.00 and something between $200,000.00 and $400,000.00 was actually paid to the court when the court granted the pre judgment seizure.

The Trustee, on numerous occasions, attempted negotiations and consulted with Frazer's husband and at least four different lawyers that claimed to represent Frazer. When an impasse was obvious, the Trustee filed an adversary proceeding, August 12, 2005, to recover the referenced stock or settlement proceeds from the Tiffin. The instant adversary proceeding joined as party Defendants, Steven Price and Starla Frazer. Subsequently, Frazer added Thomas Baddley, state court attorney, and the Trustee under a cross-claim or third party Defendants.

## II. STATEMENT OF THE CASE

This matter is before the Court on a complaint filed by the Chapter 7 Trustee, incident to the Chapter 7 bankruptcy case of Price and pursuant to 11 U.S.C. §§ 541, 542, 544, and 548 and alleging that certain settlement proceeds obtained or recovered from a State of Colorado court action are property of the estate and proceeds from the Tiffin litigation should be turned over or delivered to the Trustee. The Trustee further avers that Price and Frazer, jointly and severally, wrongfully and intentionally withheld information regarding the stock and the state court litigation and have wrongfully and intentionally asserted claims and exercised dominion over property of the bankruptcy estate. In the alternative, for actions of actual or constructive fraud, it is averred that the referenced proceeds (home and stock) should be turned over to the Trustee.

The Trustee further avers that the Price and Frazer have conspired to withhold information and to prevent the trustee from obtaining information regarding the referenced stock and the civil litigation. Moreover, Price has willfully and fraudulently neglected to discharge his duties under 11 U.S.C. § 521 by failing to disclose and mischaracterizing his interest in certain stock and a civil action filed in the Circuit Court of Franklin County, Alabama. Also, Price has given false or misleading testimony regarding his interest in the Tiffin stock and the civil action filed in the Circuit Court of Franklin County.

After filing a motion to dismiss, answer and counterclaims[4], previous motion for summary judgment, Frazer filed the instant motion for summary judgment and it is the motion for summary judgment that is the subject of this response.

### III. ISSUES

1.    Domestic proceedings are breeding grounds for bankruptcy fraud.

2.    Trustee's due diligence.

3.    Limitation of actions.

4.    Equitable tolling of actions.

### IV. STATEMENT OF THE FACTS

#### A. Material and Disputed Facts

The following facts are material and in dispute:

1) Price, at some point prior to August 2001, received a substantial inheritance from his mother's estate. This inheritance was approximately $1,600,000.00.

2) While Price had ownership and an interest in a substantial Colorado home, and had instituted a lawsuit in Franklin County, Alabama Circuit Court regarding stock ownership, also while under imminent threat of collection litigation against Price and his wife (Frazer) and possibly other litigation, Price and Frazer entered a uncontested domestic settlement agreement that gave Price his personal possessions, his fractional interest in Cross Country Freight Lines, Inc. that went in bankruptcy in approximately three months, otherwise every other marital asset was conveyed to Frazer with Price paying all the debts including a property settlement, child support, and taxes (see **Exhibit "A"**). In essence, Price received his clothes, "shaving gear", personal checking account, and interest in a defunct corporation. Frazer received everything else with Price

---

[4] Frazer brought a counterclaim against the Trustee and a crossclaim against Thomas Baddley.

with Price paying the marital debts and the debts associated with Cross Country Freight, Inc!

3) Price filed a petition for an order of relief under Chapter 11 (March 11, 2002) and the Chapter 11 was converted to Chapter 7 (April 24, 2002). In a span of approximately three months, Price had the opportunity to disclose his stock ownership. He failed in this duty when he disclosed, under oath, to questions 12, 20, and 33, Schedule B: Personal Property, as follows:

> *12. Stock and Interests in Incorporated and Unincorporated Businesses. Itemize. – 0 –*
>
> *20. Other contingent and unliquidated claims of every nature including tax refunds, counterclaims of the Debtor and rights to setoff claims. Give estimated value of each. – 0 –*
>
> *33. Other Personal Property of any kind not already listed. Itemize. No Response*

4) Price did not list any stock ownership as exempt in Schedule C.

5) In the question under the Statement of Financial Affairs, Price again misrepresented, or omitted statements of material fact. In question four (4) regarding suits and other legal type actions, Price was required to list all lawsuits in which he was a party. In an attached list, he mentioned a number (seven) of lawsuits, but failed to provide pertinent information regarding a lawsuit pending in the State of Colorado[5]. The Colorado litigation was filed on or about September 18, 2001, and required the deposit of sale proceeds with the Colorado court that came from the sale of Price and Frazer's home. Some of the pleadings and documents from the Colorado Court are attached as **Exhibit "B"**. In addition, Price failed completely to list the Tiffin litigation in the

---

[5] Great Plains Transportations Services, Inc., v. Steven L. Price, Starla W. Price, et al. District Court, Routt County, Colorado.

litigation in the Circuit Court of Franklin County, Alabama[6]. A copy of the docket summary for the Tiffin litigation is attached as **Exhibit "C"**.

6) Also in the section of Statement of Financial Affair, Section 10, Other Transfers, the only transfer referenced pursuant to the divorce decree was real estate. A full copy of the initial petition, schedules and disclosures is attached as **Exhibit "D"**.

7) In a letter to the Trustee, it was suggested that the Franklin County litigation did not go well and that Tiffin essentially won. Also, that there was no value for the stock and that the stock in question had unknown value (See **Exhibit "E"**).

8) In sworn testimony given in the Franklin County litigation, October 28, 2004, Price testified, in pertinent part, as follows (See **Exhibit "F"**):

> **Q.**    Do you own stock in Tiffin Motor Homes?
>
> **A.**    Yes, sir.
>
> **Q.**    How long have you held and owned stock in Tiffin Motor Homes?
>
> **A.**    Since 1996.
>
> **Q.**    How did you acquire that?
>
> **A.**    From my mother, who is deceased.
>
> (Circuit Court, Franklin County, AL, CV 01-223, Deposition of Price, October 28, 2004, p. 8 and 9)
>
> **Q.**    And how many shares of stock do you own?
>
> **A.**    Two hundred and fifty.
>
> **Q.**    Now, have you ever tried to sell or convey that stock in Tiffin Motor Homes?
>
> **A.**    I have.

---

[6] Steven Price, et al., v. Robert A. Tiffin, Jr., et al., CV 01-223, Circuit Court of Franklin County.

Q.    When? Tell me the circumstances, in other words, of that.

A.    I believe in 2002 I contacted Bob Tiffin in an effort to sell it and he said I had to go through the stock transfer agreement and he declined to buy it.

(Circuit Court, Franklin County, AL, CV 01-223, Deposition of Price, October 28, 2004, p. 9)

Q.    When did you offer it to him?

A.    Oh, I believe I said in March of '02 he declined.

Q.    I'm sorry. I didn't understand. So in March of '02 you say there was some offer from Bob?

A.    No. No, he didn't offer. I tried to offer it to him.

Q.    Oh, for eighteen hundred and seventy-five per share and he declined?

A.    Correct.

(Circuit Court, Franklin County, AL, CV 01-223, Deposition of Price, October 28, 2004, p. 10)

9) On January 7, 2005, Price gave a sworn affidavit that he was the legal and beneficial owner of 250 shares of Tiffin stock and that the share certificate, #24, had been lost (See **Exhibit "G"**).

10) The Tiffin litigation was settled some time in December 2004 or January 2005, and it has been alleged that the settlement was confidential.

11) A full copy of Price's Rule 2004 examination is attached as **Exhibit "H"**.

12) The Trustee's affidavit is attached as **Exhibit "I"**.

13) At material times, Price and Frazer have been represented by the same attorney.

Specifically, the same attorney has made settlement proposals regarding the Colorado proceeds (October 2002) and regarding the Tiffin stock (February 2005).

## B. Timeline

**2001**

| | | |
|---|---|---|
| 1 | August 2, 2001 | Separation  agreement and final decree of divorce |
| 2 | August 10 , 2001 | Tiffin Litigation Filed in Franklin County |
| 3 | September 18, 2001 | Colorado Litigation |
| 4 | September 20, 2001 | Sale of home in Colorado |

**2002**

| | | |
|---|---|---|
| 5 | March 11, 2002 | Price petition for bankruptcy |
| 6 | April 24, 2002 | Conversion to Chapter 7 |

**2004**

| | | |
|---|---|---|
| 7 | January and February 2004 | Colorado litigation settled and home proceeds disbursed |
| 8 | October 28, 2004 | Deposition of Price |
| 9 | December 20, 2004 | Trustee learns of Tiffin settlement |

**2005**

| | | |
|---|---|---|
| 10 | December 2004 / January 2005 | Tiffin litigation settled |
| 11 | January 7, 2005 | Affidavit of Price concerning stock ownership |

## C. Facts, Generally

As appropriate, the Trustee will cite to the case record from the United States Bankruptcy Court for the Middle District of Alabama and the record will be noted according to document number.

- 9 -

Before the Chapter 11 petition for relief and the conversion, and the conversion to Chapter 7, Frazer was married to and subsequently divorced from Price. The marriage was dissolved by final decree, without a trial, August 2, 2001, and filed with the Deputy Registrar of the Office of the Circuit Court of Montgomery County, Alabama, August 8, 2001. The instant divorce decree was a marital settlement agreement that provided, in pertinent part, the conveyance of all right, title, and interest to the parties jointly owned residence in Steamboat Springs, Colorado. Also, in the referenced marital settlement agreement, Frazer was awarded a conditional interest in the stock of Tiffin. In pertinent part, the decree provides as follows:

> The Wife shall be the sole and absolute owner of the stock in Tiffin Motor Homes, Inc. which is presently titled in the Husband's name. The Husband shall immediately execute any and all documents which are necessary to convey all right, title and interest therein to Wife to be her's absolutely. The Husband hereby warrants that there are no restrictions on the transfer or sale of said stock or upon the transfer or sale of said stock by a holder in due course. In the event there is a restriction on the transfer or sale of said stock or any limitations on the Wife's ability to liquidate said stock, the Husband shall pay to the Wife the fair market value of said stock as established by generally accepted accounting principles for the valuation of a closely held corporation.

> Price Settlement Agreement, Pages 16 – 17, paragraph 19.

A careful review of the settlement agreement wil reveal that Frazer received every significant material asset of the parties and that Price received only his personal possessions and responsibility for child support, property settlement, and all marital debts, and the debts of Cross Country.

Incident to the conveyance of the parties' residence, the Prices entered into an agreement to sell the residence and the sale was accomplished on or about September 20, 2001. Although the residence had been listed for $2,800,000.00, it sold for $1,266,000.00. Upon information and belief, it is averred that the first mortgage (deed and trust) for $775,000.00 was paid. Also, it is

believed that expenses relating to the closing have been paid. However, funds totaling $244,000.00, reflecting net proceeds, remained after the payment of liens and costs.

A few days before the Colorado home was sold, a lawsuit was filed in the District Court, Routt County, Colorado, requesting, among other things, a judgment against Price and Frazer and for a prejudgment writ of seizure regarding the net sale proceeds from the referenced home. Under bond, an order was signed September 18, 2001. It is believed that the prejudgment seizure required the deposit of between $200,000.00 and $400,000.00 into trust or escrow.

Price filed a petition for an order of relief under Chapter 11, Tile 11, March 11, 2002 (Br Price, ECF Doc. 1[7]). This case was voluntarily converted to a case under Chapter 7, April 24, 2002 (Br Price, ECF Doc. 18). Susan S. DePaola was appointed interim trustee, May 6, 2002 (Br Price, ECF Doc. 26).

There were several meetings and hearings with Price and Frazer, and the Trustee. Because of representations regarding the Tiffin stock and pending litigation, the Trustee turned her attention to the proceeds from the sale of the Price home in Colorado, and it was this issue that dominated various meetings and examinations.

While counsel for the parties to this litigation were negotiating a division of the proceeds held by the state court in Colorado, Frazer engaged new counsel and reached an agreement, without notice to the Trustee, and, upon information and belief, received and used the balance of proceeds obtained incident to this agreement.

Subsequently, the Trustee learned that Price had failed to disclose material information regarding his shares in Tiffin. In fact, while Mr. Price's stock was of grave importance and while Mr. Price was involved in state court litigation, Price failed or refused to list and identify his

ownership in 250 shares of Tiffin stock in his bankruptcy documents and failed to disclose his bankruptcy case in depositions taken incident to the state court litigation. Also, as late as January 7, 2005, Price gave an affidavit indicating ownership of the referenced shares.

Price apparently purchased or acquired the 250 shares under the will of his mother in 1996. The stock was in a closely held corporation and restricted in alienability. Price, in March 2002[8], in a written document, offered to sell the stock to Mr. Bob Tiffin for $1,875.00 per share. This offer was subsequently declined (the sale was not rejected due to the offered value, the stock was subject of a transfer and alienability agreement). In spite of the referenced offer, the Debtor failed or refused to list the stock in his bankruptcy schedules that were filed March 11, 2002.

Price was also listed or identified as a party plaintiff in civil litigation filed in the Circuit Court of Franklin County, Alabama, in 2001. Upon information and belief, the instant litigation was an attempt by minority shareholders to recover damages and for a declaration of other rights resulting from their stock ownership in Tiffin. Price also failed or refused to list this litigation in his bankruptcy schedules and disclosures when they were filed March 11, 2002. The civil action in the Circuit Court of Franklin County, Alabama has been settled or resolved. However, counsel for Mr. Thomas E. Baddley, Esq., has suggested that the terms of settlement are confidential and has admonished Plaintiff's counsel not to discuss or allege the terms of settlement. However, upon information and belief, it is averred that a portion of the settlement was apportioned to a stock value and damages.

---

[7] "Br Price, ECF Doc." indicates a document filed in the main bankruptcy case of Stephen Price, Case Number 02-30767
[8] This is the same month that Price filed his bankruptcy petition.

Notwithstanding, Frazer attempted to asset her rights against the agreed settlement proceeds from the Circuit Court of Montgomery County and the Plaintiff intervened after learning of the recovery anticipated by the Debtor.

Price received a discharge January 10, 2003 (Br ECF Doc. 55) and the bankruptcy case was closed, June 21, 2004 (Br ECF Doc. 59). The Trustee filed a motion to reopen the bankruptcy case, December 21, 2004 (Br ECF Doc. 60) and the case was ordered reopened, February 2, 2005 (Br ECF Doc. 69).

Frazer filed a motion for relief from the automatic stay, May 19, 2005 (Br ECF Doc. 71), the Trustee filed an objection, June 8, 2005 (Br ECF Doc. 73) and this motion was denied in part and granted in part, July 20, 2005 (Br ECF Doc. 78), pending the filing of the adversary proceeding.

The adversary proceeding was filed, August 12, 2005, in the United States Bankruptcy Court for the Middle District of Alabama. Defendant, Starla Frazer filed a motion to dismiss, September 14, 2005 (Ap ECF Doc. 8[9]) alleging the Plaintiff; 1) failed to state a claim upon which relief can be granted; 2) the Tiffin stock was not property of the estate; 3) the Plaintiff did not allege any facts from which collusion could be found; and, 4) the acts of collusion are time barred. This matter was set for hearing, October 14, 2005 (Ap ECF Doc. 18), and the Frazer motion was denied.

The bankruptcy court entered a scheduling order, October 20, 2005 (Ap ECF Doc. 21), however, the bankruptcy court did not provide a trial date in the order.

---

[9] "Ap ECF Doc." refers to documents submitted in the bankruptcy adversary proceeding, Case Number 05-3063.

Defendant Frazer filed her answer to the complaint and also filed a crossclaim and counterclaim, November 8, 2005 (Ap ECF Doc. 26) and included a jury demand requesting "a jury trial on all issues and claims in this adversary proceeding triable by jury".

Defendant Frazer filed a motion for summary judgment, December 28, 2005 (Ap ECF Doc. 36) alleging that the claims of the Plaintiff were time barred by the statute of limitations, 11 U.S.C. § 546 (a) and that the state law claims were also subject to § 546 limitations. Briefs were due, extended by the court, February 3, 2006 (Ap ECF Doc. 47). The court denied Defendant Frazer's motion for summary judgment, February 15, 2006 (Ap ECF Doc. 54).

The Plaintiff filed an amended complaint, March 13, 2006 (Ap ECF Doc. 59). The bankruptcy court entered a scheduling order, April 6, 2006 (Ap ECF Doc. 69) and this matter was set for trial, August 21, 2006.

The scheduling order was followed by an amended answer on behalf of Defendant Frazer, April 14, 2006 (Ap ECF Doc. 80) in which she restated a demand for jury trial.

Defendant Frazer also filed a document entitled "Starla Frazer's Motion for Summary Judgment and Memorandum in Support Thereof", May 1, 2006 (Ap ECF Doc. 86). The motion to withdraw the reference was filed May 11, 2006 (Ap ECF Doc. 89).

## V. ARGUMENTS AND AUTHORITIES

### A. Summary Judgment, Standard of Review

In bankruptcy courts, summary judgment practice is controlled by Bankruptcy Rule 7056, and therefore governed by Rule 56 of the Federal Rules of Civil Procedure, Fed. R. Bankr. P. Rule 7056; Carey Lumber Co. v. Bell, 615 F.2d 370, 378 (5th Cir. 1980). Under Fed. R. Civ. P. Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. Rule 56(c). A party requesting summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact". Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, at 322. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, 'designate specific facts showing that there is a genuine issue for trial'". Id. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324 (emphasis added). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial", Id. at 322.

After the defendants have properly responded to a proper motion for summary judgment, the court

court must grant the motion if there is no genuine issue of material fact, and the moving party is

entitled to judgment as a matter of law, Fed. R. Civ. P. 56(c). The substantive law will identify

which facts are material and which are irrelevant. Anderson v. Liberty Lobby. Inc., 477 U.S. 242,

248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party", Id. at 248. "(T)he judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for

trial," Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law", Id. at 251-252; see also, Bill Johnson's

Restaurants Inc. v. N.L.R.B., 461 U.S. 731, 745 n. 11 (1983). However, the nonmoving party

"must do more than show that there is some metaphysical doubt as to the material facts",

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence

is merely colorable, or is not significantly probative, summary judgment may be granted,

Anderson, 477 U.S. at 249 (citations omitted); accord Silence v. Zimmerman, 873 F.2d 256 (11th

Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the

substantive evidentiary burden," so there must be sufficient evidence on which the jury could

reasonably find for the plaintiff, Anderson, 477 U. S. at 254; Cottle v. Storer Comm., Inc., 849

F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence,

and the drawing of inferences from the facts are the function of the jury, and therefore the evidence

of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor,

Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but

only of every reasonable inference, Brown v. City of Clewiston, 848 F.2d 1534, 1540 n. 12 (11th

Cir. 1988).

In a recent case[10] decided by this court the following standard was suggested:

> Summary judgment is proper only when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56, made applicable to Adversary Proceedings pursuant to Fed. R. Bank. P. 7056; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed. 2d 265 (1986); Jones v. City of Columbus, 120 F.3d 248, 251 (11th Cir. 1997). Federal Rule of Civil Procedure 56(c) states the following:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

> The facts must be viewed in a light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 LED. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. at 322; Hail v. Regency Terrace Owners Association, 782 So.2d1271, 1273 (Ala. 2000). At the stage of summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. To avoid an adverse ruling on a motion for summary judgment,"the nonmoving party must provide more than a mere scintilla of evidence." See Loyd v.Ram Industries, Inc., 64 F.Supp.2d 1235, 1237 (S.D. Ala. 1999) (quoting Combs v.Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997)).

> Goodwin v. V. Restaurants, Adv. Pro. No. 05-3062-WRS

## B. Summary Judgment, Generally

The other parties in the instant litigation have followed the time worn legal path of attacking one of the parties, and in this instance the Trustee is being maligned for lack of diligence. The other parties have gone out of their way to suggest that the Trustee has not been diligent in her pursuit of the claims referenced in the adversary proceeding as amended. Nothing could be further from the truth. Therefore, to place in perspective and summarize the factual issues before the court,

---

[10] Order denying a motion for summary judgment.

issues before the court, only a short narrative will be required.

Here are the uncontroverted facts. In August and September 2001, Price and Frazer each owned an interest in a trucking company and a large palatial home in Colorado. Much of the purchase price came from Price's inheritance. After collection actions turned into litigation, the parties elected or decided upon a "friendly" divorce that put every significant material asset in Frazer's name, with Price paying child support, insurance, taxes, marital debts[11], and a substantial property settlement[12]. In other words, Price, just months before the divorce, has assets estimated at between $1,000,000.00 and $3,000,000.00, and left with personal items, a personal bank account, and stock in Cross Country of no value.

The home was sold and money placed with a Colorado court until Frazer settled her claim and took her share of the money. Although the divorce settlement agreement directed Tiffin stock or stock value[13] to Frazer, Price was actively representing to all others, except to the bankruptcy court and the Trustee, that the stock was his. In fact, when Price told the Trustee that Tiffin had essentially won the pending lawsuit and his 250 shares of stock had limited or nominal value. On the contrary, the Tiffin litigation was alive and well and while his bankruptcy was pending, he had offered the Tiffin stock to Bob Tiffin for $1,800.00 per share or **$450,000.00**.

The sale was not declined by Tiffin due to the value, the stock was subject to alienability restrictions. This offer was made the same month that Price filed his bankruptcy. Hoping that the Tiffin litigation and stock ownership would fall "under the radar screen" this matter did not surface again until shortly after the Price bankruptcy case was ordered closed[14]. Interestingly enough, even

---

[11] Specifically including the debts of Cross Country Freightlines, Inc.
[12] A copy of the settlement agreement is attached as **Exhibit "A"**.
[13] In case of restrictions including sale and alienation.
[14] June 21, 2004

enough, even after the Trustee intercepted information and attended the domestic relations hearing

in Montgomery County Circuit Court, December 2004, Price still adamantly maintained his stock

ownership when he gave his affidavit (**Exhibit "F"**).

When viewed as a whole, the Trustee has successfully pursued and made every effort to

collect property of the estate in spite of and under a pattern of abuse, fraud, and deception.

### C. Issues

### 1. Domestic proceedings are "breeding grounds" for bankruptcy fraud.

A trustee is provided power to undo domestic transactions that were entered prior to

bankruptcy and designed to restrict or frustrate creditors. In fact, the trustee has power to avoid

transfers accomplished with actual and constructive fraud intent, 11 U.S.C. § 548(a)(1). Subsection

(A) provides for avoidance of transfers with actual fraud and subsection (C) the avoidance of

transfers with constructive fraud, Buncher Co. v. Official Comm. of Unsecured Creditors of

GenFarm Ltd., 229 F.3d 245, 250 (3d Cir.2000).

Fraud, actual or constructive, can be found in a number of ways and one way is the

unequal, or inequitable, distribution of assets in a divorce proceeding. In Andrea Dobin, v. Daniel

Hill, (In re Phyllis Ann Hill), 2006 WL 1305083, at *8 (Bkrtcy.D.N.J.)

> For purposes of § 548, a division of property pursuant to a divorce decree
> is a "transfer" of property and therefore may be challenged by a trustee as a
> fraudulent transfer. *In re Fordu*, 201 F.3d 693, 702 (6th Cir.1999). This is true
> even where the "transfer" is the decision not to exercise a right to equitable
> distribution. *See Fordu*, 201 F.3d at 709 (decision to forgo a claim for equitable
> distribution of spouse's lottery winnings and the marital residence was held to
> be a fraudulent transfer). Further, principles of collateral estoppel and res
> judicata will not apply as creditors are not parties to a divorce proceeding.
> *Fordu*, 201 F.3d at 705. As one court noted, "the fact that a transfer occurs in
> the context of a divorce proceeding does not immunize such transfer from a §
> 548 attack by a trustee in bankruptcy for one of the marital partners." *In re
> Sorlucco*, 68 B.R. 748, 753 (Bankr.D.N.H.1986). Courts have found that
> certain divorce proceedings with unequal divisions of property may be an

- 19 -

with unequal divisions of property may be an attempt to keep assets away from the creditor of one spouse and consequently are open to attack as actual fraudulent transfers. *See Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995). Where a transfer of property is made to a spouse by means of a "fast-track" divorce on the eve of bankruptcy, this is often evidence of a fraudulent scheme to keep property from creditors. *In re Chevrie,* 2001 WL 120132 at *10 (Bankr.N.D.Ill.2001).

In addition, the Hill court found that some divorces are clearly a sham when the parties continue to live together after the divorce. Put another way, to suggest or at least construe fraud is through the unequal distribution of marital property.

In other cases, there are situations in which a bona fide divorce exists, but the transferor nonetheless favors transferring assets to the ex-spouse rather than seeing them go to a creditor body. Although the divorce may be valid, the same may not hold true for the division of marital property. In *In re Sorlucco,* the court considered an argument by the trustee that the transfer of the martial assets pursuant to a divorce settlement was constructively fraudulent where an equal exchange did not occur. 68 B.R. at 753. The court determined that Congress' use of the phrase "reasonably equivalent value" did not require an equal exchange, but did require that the exchange be "within the range of likely distribution that would be ordered by the state divorce court if the property division had actually been litigated." *Id.* Additionally, the court required the exchange be the result of "arms-length" bargaining. *Id.* at 755. Applying these standards, the court in *In re Williams* found that while the divorce itself was valid, there was collusion between the parties and the property settlement agreement they reached was fraudulent where the terms where not within the likely range of what a state court judge might order. 159 B.R. 648 (Bankr.D.R.I.1993) (debtor had transferred "virtually the entire marital estate" to the ex-spouse as part of the divorce settlement while he had a present debt to his creditor of $4 to $6 Million. Ex-spouse had no debt and was employed with an starting salary of over $100,000).

Hill, at 9

In the instant case, not only did Price convey away all of his assets approximately seven months before bankruptcy, Price also omitted or misrepresented material information regarding his assets to the bankruptcy court and the bankruptcy trustee. In addition, Price continued to exercise ownership and authority of the Tiffin stock until the Trustee finally gained information regarding

pending litigation and a multimillion dollar settlement in which Price was to participate.

As a result, the Trustee has brought an action against Frazer to void the transfers of proceeds and stock under §§ 548 and 541 and against Frazer and Price to recover or reclaim estate property § 542.

### 2. Trustee's due diligence

The parties, except the Trustee of course, have pointed to and suggested a lack of diligence on the part of the Trustee. However, under the sordid facts of the instant case, the Trustee is not on trial. The Trustee will not allow the focus to be redirected to her when Price and/or Frazer have done virtually everything in their power to stifle the Trustee's investigation, and to hide the Tiffin stock and settlement proceeds, pending litigation, and the value of the stock. The purpose of the Parties effort to suggest a lack of diligence is merely intended as a *red herring* and used only to argue against equitable tolling in the event the Trustee continues her claim under 11 U.S.C. § 548.

> [T]he extent to which a plaintiff used reasonable diligence is tested by an objective standard. <u>14 F.3d at 1385</u>.  Due diligence requires a trustee to conduct searches that are realistic in the ordinary course of a trustee's performance of his duties.  See <u>*In re Levy*, 185 B.R. 378, 381 (Bankr.S.D.Fla.1995)</u>.  Searches need not be so extensive that service as a trustee is rendered economically implausible. <u>*Id.* at 386</u>.  **A trustee's reliance on the sworn schedules and statements filed by a debtor at the commencement of a bankruptcy case does not preclude invocation of the doctrine of equitable tolling.** *Id.* For example, due diligence did not require a trustee to undertake a routine property search which would have uncovered a property interest of the debtor which the debtor had failed to indicate in his schedules and statements. *Id.*
>
> <u>Timothy D. Moratzka, v. Jeanette Mary Pomaville, (In re John H. Pomaville)</u> 190 B.R. 632 *637 **[emphasis added]**

In the instant case, the Trustee gained only general and ambiguous information about the Debtor's stock ownership and the pending Tiffin litigation. In following up, and in response to the

the Trustee, the Debtor suggested that his stock was hopelessly without value and the pending

litigation had been resolved in favor of Tiffin. The only thing left to pursue was the home sale

proceeds in Colorado. However, while negotiating a settlement regarding these proceeds, Frazer

did an "end run", after entering an agreement, in principle with t he Trustee, negotiated her own

settlement, and received proceeds from the home sale.

Price and Frazer have worked diligently to frustrate the Trustee and her efforts to initiate a

recovery for the creditors of the Price bankruptcy. In this regard, the Judge in Pomaville said it

best:

> A bankruptcy case presents a rather different slant on equitable tolling. In the typical situation, it is the debtor's conduct rather than the defendant's conduct which invokes equitable tolling. In some senses, this is unfair to the defendant. On the other hand, unlike the usual civil case where a plaintiff at least has the advantage of being a party to the underlying transaction, a bankruptcy trustee must rely almost entirely on a third party (the debtor) to provide the information necessary to uncover avoidable transfers, Pomaville at *637

The courts have repeatedly emphasized, it is the actions of the Debtor that are at issue and

not the actions of the Trustee.

### 3. Limitation of actions

So there is no confusion regarding the issue of limitation of actions in the instant case, the

following standards prevail. First, for an action under 11 U.S.C. § 548, such actions are limited and

controlled by 11 U.S.C. § 546, which says

§ 546. Limitations on avoiding powers

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—

(1) the later of—

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

*11 U.S.C. § 546*

Second, the limitation for the fraudulent conveyance of real estate, under the Alabama

Fraudulent Transfer Act, Ala. Code § 8-9 et seq (1975), is **ten years**, § 8-9A-4(a). The companion

limitation for personal property is **six years**, § 8-9A-4(a).

Third, there is no applicable limitation period under 11 U.S.C. § 524 when the trustee

attempts to reclaim or recover estate property, In re Mushroom Transp. Co., Inc. 227 B.R. 244,

*260 (Bkrtcy.E.D.Pa.,1998) citing *In re 31-33 Corp.,* 100 B.R. 744, 747-48 (Bankr.E.D.Pa.1989)

(Scholl, B.J.); *see also In re A.J. Lane & Co., Inc.,* 167 B.R. 729, 732 (Bankr.D.Mass.1994).


Finally, one might improperly argue that the limitation imposed for fraudulent conveyance

(11 U.S.C. § 548) also limits actions under the strong arm statute of 11 U.S.C. § 544. This is

absolutely not the case, as observed in Dona McGoldrick v. Brian McGoldrick, et al., (In re Brian

McGoldrick), 117 B.R. 554, (C.D. CA.1990). Although this case is not directly on point, it stands

for the proposition that a limitation under state law will not inhibit an action under the bankruptcy

code and vice versa. Said another way, the remedies available to the trustee are cumulative.:

- 23 -

One may argue that the two-year limitation of <u>Section 546(a)</u> is merely an outside bar imposed on the law of the forum state in the interests of speedy resolution of bankruptcy cases, but does not prevent the application and running of the forum state's statute of limitations between the date the bankruptcy case is commenced and the limit set by <u>Section 546(a)</u>.  In other words, <u>Section 546(a)</u> might be read as limiting the time available under the state statute of limitations, but not expanding it beyond its expiration date.

This court rejects such an interpretation of the interplay between <u>Sections 544</u> and <u>546(a)</u> because it leads to results antithetical to notions of fair play and equal distribution among creditors.  If an otherwise meritorious cause of action would expire under state law without regard to the appointment of a trustee, then an unscrupulous debtor could manipulate the case under chapter 11 until the expiration of the cause of action under state law, depriving the trustee of an important avoidance tool which the debtor had no incentive to utilize. Similarly, in a Chapter 7 case, the stay of actions of creditors, gained on commencement of the case, may allow the forum state's statute to expire while the trustee is still investigating the assets of the estate.

<u>Id</u> at 560 - 561

In two separate motions, Frazer has suggested that the Trustee did not timely act. This is not correct and it is time to move on. The Trustee has six years under her claim which was amended and added under § 544. Also, in that equitable tolling controls the action under § 548, the claim for a fraudulent conveyance is also timely. Finally, there is not a prevailing limitation for recovery actions under § 542.

### 4. Equitable tolling of actions

As indicated in <u>Pomaville</u>, it is the Defendants actions, not the Trustee's actions, which invoke equitable tolling. The reason is very simple; a Trustee, usually working with limited resources, is substantially obliged to rely upon the Debtor for information. If the Debtor omits essential information or provides misleading information, the Trustee is put at a difficult disadvantage. If the Debtor actively conceals or obfuscates information, it makes the situation practically impossible.

To make matters worse, when the Trustee sough information regarding the Tiffin litigation, the investigation, or request for information, was frustrated with a claim that terms of the litigation were confidential.

In the instant case, court documents supposedly convey the Tiffin stock to Frazer. However, Price failed or refused to either acknowledge the stock conveyance or stock ownership. Also, Price suggests that the Tiffin case was lost and that the stock had no value. On the other hand, in the very month Price filed for bankruptcy he offered the stock for $450,000.00 and was actively participating in pending litigation that had not been lost or dismissed. Additionally, on at least two occasions after bankruptcy, Price suggested under oath ownership of the Tiffin stock. These actions by the **Debtor** are clearly sufficient to equitably toll the two year limitation invoked by 11 U.S.C. § 546.

The equitable principle of tolling is not unfamiliar to the federal court system. In the case of Bruce H. Levitt, v. Riddell Sports, Inc. (In Re Macgregor Sporting Goods, Inc.), 199 B.R. 502, (D.NJ.1995)… "State common law tolling doctrines are incorporated by 11 U.S.C. § 108 and are, therefore, applicable in bankruptcy proceedings. *Ambrose Branch Coal Co. v. Tankersley,* 106 B.R. 462, 465 (W.D.Va.1989); *see also Bohus v. Beloff,* 950 F.2d 919, 924 (3d Cir.1991) (state tolling principles are used by a federal court when it is applying a state limitations period)", Levitt at 513.

The principle of equitable tolling recognized in common law is also recognized by bankruptcy courts with respect to fraudulent conveyances. In McGoldrick,

> The federal doctrine of equitable tolling has since been applied to statutes of limitation in cases involving preferential and post-petition transfers, as well as fraudulent conveyances. *See In re Bookout Holsteins, Inc.,* 100 B.R. 427 (Bkrtcy.N.D.Ind.1989) (statute of limitations tolled where post-petition transfer under Section 549 has been concealed); *In re Butcher,* 72 B.R. 247, 250 (Bkrtcy.E.D.Tenn.1987) (limitation period under Section 546(a) tolled where fraud is concealed); *In re Clifford Josefik,* 72 B.R. 393 (Bkrtcy.N.D.Ill.1987) (recognizing equitable tolling in a fraudulent conveyance action but applying

conveyance action but applying state statute of limitations); _In re Metzeler, 66 B.R. 977, 981 (Bkrtcy.S.D.N.Y.1986)_ (_Bailey_ tolling doctrine applicable to Section 546(a); tolling denied for lack of diligence in discovery). The doctrine is "read into every federal statute of limitations." _Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946)._

McGoldrick at 558

The key words used to activate equitable tolling are words like concealment, fraud, and lack of diligence. These key words do not describe the actions of the Trustee, but are intended to describe the conduct of the Debtor. Each of these key words describe the actions of the Debtor.

In the instant case, the Debtor has callously and blatantly failed in his duties as a debtor under the code, 11 U.S.C. § 521, omitted material information, and in misrepresenting the truth regarding pending litigation and his stock ownership. It has not been said, to this point, but will be said now; it is anticipated that testimony will reveal Price's active involvement in the Tiffin litigation when his bankruptcy was filed and at other material times during bankruptcy case administration. Also, evidence may yet reveal the knowledge of other parties regarding Price's bankruptcy before the case was closed. All of these matters go to the issue of equitable tolling.

Not only has it been recognized that a motion for summary judgment is not appropriate when fraud is involved, but it is also not appropriate when the question of equitable tolling is involved. Again in, Levitt , the court found that "...the question regarding tolling of the statute of limitations involves factual issues which cannot be resolved in the absence of discovery. The tolling issue cannot be resolved on a motion to dismiss, nor can it be resolved on the basis of affidavits submitted in support of a motion for summary judgment", Levitt at 516.

The actions on the part of the Defendant cry for relief and should allow the expansion of the normal tolling period for the fraudulent conveyance action under 11 U.S.C. § 548.

## VI. CONCLUSION

- 26 -

Frazer's counsel, with great delight, in conversation and brief have used several factual and legal points to either embarrass or evidence a lack of diligence on the part of the Trustee and her counsel. It was initially decided to avoid this fight, however, bad judgment prevails on the part of the Trustee's counsel. First, it has been impossible to negotiate even the most minute detail with Frazer. When a settlement was reached, in principle, regarding the proceeds held in Colorado, Frazer went to another lawyer and settled on her own. When negotiations were enjoined regarding the Tiffin stock, discussion were stopped and started as often as Frazer secured substitute counsel. As to the legal issues involving the <u>Grace</u> and <u>Golden</u> cases, the facts in <u>Grace</u> and <u>Golden</u> are so materially different that they are not even "on the same planet".

The material facts in this case reveal that Price had significant and substantial assets before the separation agreement that could have been used to satisfy creditor claims. In a collusive divorce, Frazer, who virtually had no individual assets, ended with everything.

From the date of the divorce through January 2005, Price treated the Tiffin stock as his property in everything that he said and did. But there was one major problem, what he was saying under oath was different from what he told the Trustee and to say nothing of the fraud that he caused through his misleading bankruptcy documents.

Through fraud and deception, the Trustee has finally caught up and brought an appropriate action or actions to collect estate property or void alleged transfers. Those actions are timely filed and the second motion for summary judgment is due to be DENIED.

Respectfully submitted on this the 13th day of June 2006.

Memory Day & Azar


By/S/ Von G. Memory
Von G. Memory
ASB-8137-071V

James L. Day
ASB-1256-A55J

Attorneys for Susan S.
DePaola, Trustee

OF COUNSEL

Memory Day & Azar
P.O. Box 4054
Montgomery, AL 36013
Tel (334) 834-8000
Fax (334) 834-8001
vgmemory@memorylegal.com
jlday@memorylegal.com

## CERTIFICATE OF SERVICE

    I hereby certify that I have this date served a copy of the foregoing document on the following, by:

    ☑ placing same in the United States Mail, postage prepaid, and properly addressed

    ☐ facsimile

    ☐ hand delivery

    ☐ delivered in open court

on June 16, 2006.

David B. Anderson, Esq.
Waller Lansden Dortch & Davis, LLC
AmSouth Harbert Plaza, Suite 1900
Birmingham, AL 35203

Deanna L. Weidner, Esq.
Waller Landsden Dortch & Davis, LLP
1901 6th Avenue North
Suite 1400
Birmingham, AL 35203

Charles Nichols Parnell, III, Esq.
Parnell & Crum, PA
PO Box 2189

Montgomery, AL 36102-2189

Andre M. Toffel, Esq.
Andre' M. Toffel, P. C.
1929 Third Avenue North, Suite 400
Birmingham, AL 35203

/S/ Von G. Memory

**EXHIBIT E**

**Letter to Trustee**

# PARNELL & CRUM, P. A.

ATTORNEYS AT LAW
641 SOUTH LAWRENCE STREET
MONTGOMERY, ALABAMA 36104
Email: mpurnell@parnellcrum.com

CHARLES N. PARNELL, III
G. BARTON CRUM
ROBERT J. RUSSELL, JR.
BRITT BATSON GRIGGS
K. ANDERSON NELMS
MATTHEW T. ELLIS
ADRIAN D. JOHNSON

Monday, October 14, 2002

TELEPHONE
334-832-4200

TELECOPIER
334-293-3550

MAILING ADDRESS
P.O. BOX 2189
ZIP CODE 36102-2189

RECEIVED
OCT 15 2002

Hon. Susan Shirock DePaola, Esq., Trustee
Suite 601, One Commerce Street
Montgomery, Alabama 36104

RE:    Stephen L. Price, Debtor v.
       Starla Price
       Chapter 7 Case No. 02-30767

Dear Susan:

Per your request, and after meeting with my client, I am writing to give you a settlement offer, on behalf of Starla Price, in the above-referenced case. First of all, let me emphasize that Starla does not believe that when one considers the entire settlement that she received in the bankruptcy case, and then one considers what has happened in the 15 months since the divorce became final, that she was preferred or the recipient of any sort of fraudulent conveyance, as a result of the Divorce Decree, in any form or fashion. The sheet that you got from Stephen's former divorce attorney in Colorado was, in my personal opinion, nothing more than posturing by that attorney in an attempt to keep jurisdiction of the divorce proceeding in Colorado, and to maximize Stephen's position in that divorce case, in the event Colorado was the venue for the divorce. Many of the assets that were valued on that sheet are old, and by that, I do not mean they are antiques, and have only a fraction of the value that sheet alleges.

I think it is important for you to review, almost from a balance sheet standpoint, the assets and liabilities that Starla Price ended up with as a result of the divorce. In this case, we have the benefit of hindsight, in the sense that the divorce occurred almost 15 months ago, and we can see what has happened since then. When Stephen and Starla separated in January of 2001, it is my understanding that Stephen closed most of the bank accounts and took possession of most of the cash the marriage had accumulated at that time. That money was put into and lost in the operation of the trucking company, but Starla had little money on which to operate when she moved back to Alabama. I think you can group into three major categories the assets that Starla received in the divorce. First, she got the household furnishings, jewelry and other personalty. Having gotten a copy of the valuations put on that property by the Colorado attorney, I am aware of those numbers, but I am also aware that you have heard Stephen testify on at least two different occasions that those numbers were extremely high. I don't think that you could get even half of what Stephen estimated the furniture to be worth at any sort of sale. You know from your own experience that used furniture is difficult to sell, and usually brings a low price. Old fur coats are just that. Old and of little value. Styles of fur coats change, and we think the fur coat that Stephen inherited from his mother and that Starla got in the divorce has little value. Much of the jewelry is old, some of it costume jewelry, and we think its value is much less than the sheet indicates.

The second category of assets is the stock in Tiffin Motor Homes. A group of minority shareholders filed what I understand to be something in the nature of a stockholders derivative action against Bob Tiffin, claiming mismanagement, violation of the rights of minority stockholders, preferential treatment of management, and so forth. At one time, when that suit was first filed, Mr. Tiffin was attempting to acquire as much of the stock as possible to, I guess, make the case go away or settle it. He was unable to acquire very much of the stock, and ended up

litigating the case. Stephen tells me, from information he obtained from his father, Dr. Grady Price, who is also one of the minority shareholders, that the litigation did not go well for the minority shareholders, and that, in essence, Tiffin won. The stock is paying no dividends. None of the minority shareholders want to buy any more stock. Most of the minority shareholders would love to sell their stock. Tiffin has no incentive to buy the stock anymore, and from what I am told, he is not offering anything at this point in time for any of the stock held by the minority shareholders. In short, there is simply no market for the stock. I am sure that if someone put an extremely low price on the stock, it would sell, but it is not generating any cash through dividends, and, at this point in time, it has an unknown value, for the reasons indicated.

The third and final category is the equity in the home in Steamboat Springs. When Starla agreed to the divorce, she as of the opinion that the house had a value well in excess of $2 million. I think you will remember at the time of Stephen's Rule 2004 examination a couple of weeks ago, that Stephen produced copies of listing agreements and multiple realtor listings showing that the house was originally put on the market for $2.75 million. When it did not sell, Stephen lowered the price to $2.4 million. The mortgage balance was somewhere around $850,000.00. Starla certainly understood and anticipated that she would get well over $1 million in cash, net of the mortgage and net of the auction expenses, when she decided to auction the property. Unfortunately, she did not know that September 11th would occur, and that would depress the price by probably 50% or more. Instead of getting well over $1 million, the net equity turned out to be $265,000.00. To add insult to injury, she was unable to get even that amount of cash because, as you know, Great Plains Factoring Company did a pre-judgment attachment and seized the money before she could get it out of the state of Colorado. Hence, she has received nothing in the way of cash out of that asset, which she thought would be the money that she would use to buy a home here in Montgomery, and to educate the two children born during the marriage.

Now, let's take a brief look at the liability side of the slate. Starla has been sued in Colorado by Great Plains, alleging that she, as a guarantor of their debt, owes them in excess of $300,000.00. Conseco Finance has sued her over her personal guaranty on a lease or leases covering 19 refrigerated trailers. Their attorney in Atlanta, Mr. Robert Solomon, has told me that Conseco is estimating that a deficiency balance of between $110,000.00-$140,000.00 will result, after the trailers are sold. It could be larger. She has been sued by local attorney Dan Feinstein on behalf of Fifth Third Bank of Cincinnati on an unsecured note. Her liability in that case is in excess of $150,000.00. As I shared with you, she is a guarantor on the bond given to ComData to secure the ability of the drivers to buy fuel on the road for Cross Country Freight Lines. FirstStar Bank in Cincinnati claims that she is a personal guarantor on their debt. We have not seen an itemized deficiency yet, but estimate that it will be in excess of $50,000.00. Starla is not aware of any other personal guaranty agreements, but there could be others that she has forgotten about over the course of time.

Stephen has not paid her any child support or alimony in months. Stephen has not yet found a job, and has no income and no ability to pay anything, and Starla does not know when that will change. Even if Stephen finds new employment, we can expect that his salary will be no more than, and probably less than, $50,000.00 per year, which means that the child support that he will be able to pay her will only be a fraction of what the Divorce Decree requires. Starla has incurred thousands of dollars worth of attorney's fees and litigation expense fighting off all of the creditors' claims that have pursued her, and trying to protect her situation. At the present time, she basically is the sole support of her two children born during the marriage with Stephen. If it were not for her mother and father's help, and the help of her brother, all of whom live here in Montgomery, Starla could not have made it over the last few months.

Starla desperately needs to settle the case with Great Plains in Colorado. The litigation expense is something she simply cannot afford. My fear is that if we do not settle that case, Starla will run out of money, her attorney will withdraw, and Great Plains will, by default, get all of the money out there. We certainly would encourage you, as Trustee, to enter that litigation and fight for the money, if you think that you have a cause of action, but from what I know about your estate so far, there is no money there to pay for attorney fees in Colorado. Starla's attorney in Colorado has tried desperately to settle that case in the last few months. Starla was most reluctant, initially, to settle the case for any amount, for reasons that aren't important in this letter, and would only unduly extend the length of the letter. In essence, Starla felt like she has warned Great Plains not to continue to do business with Cross Country when Richard Buswell became involved with the management of the company. Through her father and other sources, Starla had found out what Buswell had done to George Hutchinson, Transportation Management, Donnell Trucking and others, and saw the handwriting on the wall. She warned Stephen and she warned Great Plains what was about to happen, and told them that she would not be responsible if Great Plains lost money as a result of continuing to do business with Cross Country, under those circumstances. They laughed at her and told her she didn't know what she was talking about, even though she outlined exactly what did happen weeks in advance of the actual occurrence of the events. Starla thought that because of all of that, she should not be held personally liable for the debt that incurred during Buswell's involvement with Cross Country. Subsequently, she realized that even though that was a defense, litigating that claim was going to be something she could not afford. She finally authorized her attorney in Colorado to try to split the money 50/50 between herself and Great Plains. Unfortunately, Great Plains turned that down. The best offer that she has been able to obtain is a disbursement of $110,000.00 to her, $155,000.00 to Great Plains. She would like to take that offer, but now, since you have contacted the attorneys there, they are unwilling to settle without your consent.

The final analysis I would like to do for you in this long letter is a review of the equities between Stephen and Starla in that money. First of all, Starla was always a joint owner of the property, so I think we can safely say that, assuming everyone agrees the settlement on the table is fair, that half of the $110,000.00 would belong to Starla, anyway. That would limit your potential recovery to $55,000.00. Starla is willing to split 50/50 with you the remaining $55,000.00. She believes that is fair, based on the fact that Stephen was supposed to pay all of the debts that she is now being stuck with, including the Great Plains debt, the Fifth Third Bank, the Conseco debt, the ComData debt, the FirstStar Bank debt, and so forth. Those debts clearly add up to well in excess of $400,000.00 or more, and as I stated above, there could be other guaranty obligations that Starla has forgotten about over time. She is going to need some money to settle those claims for hopefully 10-15¢ on the dollar, if the creditors will accept.

Accordingly, with all of that said, our offer of settlement is to pay you $27,500.00. I think if you will accept this settlement, we can get in touch with Starla's attorney in Steamboat Springs, Colorado, and wrap-up the settlement quickly. We, obviously, will agree that the money will be paid directly to you, with the balance due Starla paid to her. Time is critical, and I would appreciate your responding as soon as possible.

Sincerely,

Charles N. Parnell, III

map

cc:    Ms. Starla Price
        8121 Long Needle Place
        Montgomery, Alabama 36117

# SAMFORD & DePAOLA, P.C.
## ATTORNEYS & COUNSELORS AT LAW

William James Samford, Jr.*
Susan Shirock DePaola

One Commerce Street • Suite 601
Montgomery, Alabama 36104
Telephone (334) 262-1600
Facsimile (334) 262-1638

*Also Admitted in D.C.

TO:    Von Memory        Fax:  834-8001

FILE NO.: Price

FROM:  Susan Shirock DePaola

**Von,    Take a look at this and let me know what you think. I have not received a motion appointing you to serve as attorney for the Trustee--SSD**