# EXHIBIT E

# Letter to Trustee

# PARNELL & CRUM, P. A.

ATTORNEYS AT LAW
641 SOUTH LAWRENCE STREET
MONTGOMERY, ALABAMA 36104
Email: mpurnell@parnellcrum.com

CHARLES N. PARNELL, III
G. BARTON CRUM
ROBERT J. RUSSELL, JR.
BRITT BATSON GRIGGS
K. ANDERSON NELMS
MATTHEW T. ELLIS
ADRIAN D. JOHNSON

TELEPHONE
334-832-4200

TELECOPIER
334-293-3550

MAILING ADDRESS
P.O. BOX 2189
ZIP CODE 36102-2189

Monday, October 14, 2002


RECEIVED
OCT 15 2002

Hon. Susan Shirock DePaola, Esq., Trustee
Suite 601, One Commerce Street
Montgomery, Alabama 36104

RE:  Stephen L. Price, Debtor v.
     Starla Price
     Chapter 7 Case No. 02-30767

Dear Susan:

   Per your request, and after meeting with my client, I am writing to give you a settlement offer, on behalf of Starla Price, in the above-referenced case. First of all, let me emphasize that Starla does not believe that when one considers the entire settlement that she received in the bankruptcy case, and then one considers what has happened in the 15 months since the divorce became final, that she was preferred or the recipient of any sort of fraudulent conveyance, as a result of the Divorce Decree, in any form or fashion. The sheet that you got from Stephen's former divorce attorney in Colorado was, in my personal opinion, nothing more than posturing by that attorney in an attempt to keep jurisdiction of the divorce proceeding in Colorado, and to maximize Stephen's position in that divorce case, in the event Colorado was the venue for the divorce. Many of the assets that were valued on that sheet are old, and by that, I do not mean they are antiques, and have only a fraction of the value that sheet alleges.

   I think it is important for you to review, almost from a balance sheet standpoint, the assets and liabilities that Starla Price ended up with as a result of the divorce. In this case, we have the benefit of hindsight, in the sense that the divorce occurred almost 15 months ago, and we can see what has happened since then. When Stephen and Starla separated in January of 2001, it is my understanding that Stephen closed most of the bank accounts and took possession of most of the cash the marriage had accumulated at that time. That money was put into and lost in the operation of the trucking company, but Starla had little money on which to operate when she moved back to Alabama. I think you can group into three major categories the assets that Starla received in the divorce. First, she got the household furnishings, jewelry and other personalty. Having gotten a copy of the valuations put on that property by the Colorado attorney, I am aware of those numbers, but I am also aware that you have heard Stephen testify on at least two different occasions that those numbers were extremely high. I don't think that you could get even half of what Stephen estimated the furniture to be worth at any sort of sale. You know from your own experience that used furniture is difficult to sell, and usually brings a low price. Old fur coats are just that. Old and of little value. Styles of fur coats change, and we think the fur coat that Stephen inherited from his mother and that Starla got in the divorce has little value. Much of the jewelry is old, some of it costume jewelry, and we think its value is much less than the sheet indicates.

   The second category of assets is the stock in Tiffin Motor Homes. A group of minority shareholders filed what I understand to be something in the nature of a stockholders derivative action against Bob Tiffin, claiming mismanagement, violation of the rights of minority stockholders, preferential treatment of management, and so forth. At one time, when that suit was first filed, Mr. Tiffin was attempting to acquire as much of the stock as possible to, I guess, make the case go away or settle it. He was unable to acquire very much of the stock, and ended up

litigating the case. Stephen tells me, from information he obtained from his father, Dr. Grady Price, who is also one of the minority shareholders, that the litigation did not go well for the minority shareholders, and that, in essence, Tiffin won. The stock is paying no dividends. None of the minority shareholders want to buy any more stock. Most of the minority shareholders would love to sell their stock. Tiffin has no incentive to buy the stock anymore, and from what I am told, he is not offering anything at this point in time for any of the stock held by the minority shareholders. In short, there is simply no market for the stock. I am sure that if someone put an extremely low price on the stock, it would sell, but it is not generating any cash through dividends, and, at this point in time, it has an unknown value, for the reasons indicated.

The third and final category is the equity in the home in Steamboat Springs. When Starla agreed to the divorce, she as of the opinion that the house had a value well in excess of $2 million. I think you will remember at the time of Stephen's Rule 2004 examination a couple of weeks ago, that Stephen produced copies of listing agreements and multiple realtor listings showing that the house was originally put on the market for $2.75 million. When it did not sell, Stephen lowered the price to $2.4 million. The mortgage balance was somewhere around $850,000.00. Starla certainly understood and anticipated that she would get well over $1 million in cash, net of the mortgage and net of the auction expenses, when she decided to auction the property. Unfortunately, she did not know that September 11th would occur, and that would depress the price by probably 50% or more. Instead of getting well over $1 million, the net equity turned out to be $265,000.00. To add insult to injury, she was unable to get even that amount of cash because, as you know, Great Plains Factoring Company did a pre-judgment attachment and seized the money before she could get it out of the state of Colorado. Hence, she has received nothing in the way of cash out of that asset, which she thought would be the money that she would use to buy a home here in Montgomery, and to educate the two children born during the marriage.

Now, let's take a brief look at the liability side of the slate. Starla has been sued in Colorado by Great Plains, alleging that she, as a guarantor of their debt, owes them in excess of $300,000.00. Conseco Finance has sued her over her personal guaranty on a lease or leases covering 19 refrigerated trailers. Their attorney in Atlanta, Mr. Robert Solomon, has told me that Conseco is estimating that a deficiency balance of between $110,000.00-$140,000.00 will result, after the trailers are sold. It could be larger. She has been sued by local attorney Dan Feinstein on behalf of Fifth Third Bank of Cincinnati on an unsecured note. Her liability in that case is in excess of $150,000.00. As I shared with you, she is a guarantor on the bond given to ComData to secure the ability of the drivers to buy fuel on the road for Cross Country Freight Lines. FirstStar Bank in Cincinnati claims that she is a personal guarantor on their debt. We have not seen an itemized deficiency yet, but estimate that it will be in excess of $50,000.00. Starla is not aware of any other personal guaranty agreements, but there could be others that she has forgotten about over the course of time.

Stephen has not paid her any child support or alimony in months. Stephen has not yet found a job, and has no income and no ability to pay anything, and Starla does not know when that will change. Even if Stephen finds new employment, we can expect that his salary will be no more than, and probably less than, $50,000.00 per year, which means that the child support that he will be able to pay her will only be a fraction of what the Divorce Decree requires. Starla has incurred thousands of dollars worth of attorney's fees and litigation expense fighting off all of the creditors' claims that have pursued her, and trying to protect her situation. At the present time, she basically is the sole support of her two children born during the marriage with Stephen. If it were not for her mother and father's help, and the help of her brother, all of whom live here in Montgomery, Starla could not have made it over the last few months.

Starla desperately needs to settle the case with Great Plains in Colorado. The litigation expense is something she simply cannot afford. My fear is that if we do not settle that case, Starla will run out of money, her attorney will withdraw, and Great Plains will, by default, get all of the money out there. We certainly would encourage you, as Trustee, to enter that litigation and fight for the money, if you think that you have a cause of action, but from what I know about your estate so far, there is no money there to pay for attorney fees in Colorado. Starla's attorney in Colorado has tried desperately to settle that case in the last few months. Starla was most reluctant, initially, to settle the case for any amount, for reasons that aren't important in this letter, and would only unduly extend the length of the letter. In essence, Starla felt like she has warned Great Plains not to continue to do business with Cross Country when Richard Buswell became involved with the management of the company. Through her father and other sources, Starla had found out what Buswell had done to George Hutchinson, Transportation Management, Donnell Trucking and others, and saw the handwriting on the wall. She warned Stephen and she warned Great Plains what was about to happen, and told them that she would not be responsible if Great Plains lost money as a result of continuing to do business with Cross Country, under those circumstances. They laughed at her and told her she didn't know what she was talking about, even though she outlined exactly what did happen weeks in advance of the actual occurrence of the events. Starla thought that because of all of that, she should not be held personally liable for the debt that incurred during Buswell's involvement with Cross Country. Subsequently, she realized that even though that was a defense, litigating that claim was going to be something she could not afford. She finally authorized her attorney in Colorado to try to split the money 50/50 between herself and Great Plains. Unfortunately, Great Plains turned that down. The best offer that she has been able to obtain is a disbursement of $110,000.00 to her, $155,000.00 to Great Plains. She would like to take that offer, but now, since you have contacted the attorneys there, they are unwilling to settle without your consent.

The final analysis I would like to do for you in this long letter is a review of the equities between Stephen and Starla in that money. First of all, Starla was always a joint owner of the property, so I think we can safely say that, assuming everyone agrees the settlement on the table is fair, that half of the $110,000.00 would belong to Starla, anyway. That would limit your potential recovery to $55,000.00. Starla is willing to split 50/50 with you the remaining $55,000.00. She believes that is fair, based on the fact that Stephen was supposed to pay all of the debts that she is now being stuck with, including the Great Plains debt, the Fifth Third Bank, the Conseco debt, the ComData debt, the FirstStar Bank debt, and so forth. Those debts clearly add up to well in excess of $400,000.00 or more, and as I stated above, there could be other guaranty obligations that Starla has forgotten about over time. She is going to need some money to settle those claims for hopefully 10-15¢ on the dollar, if the creditors will accept.

Accordingly, with all of that said, our offer of settlement is to pay you $27,500.00. I think if you will accept this settlement, we can get in touch with Starla's attorney in Steamboat Springs, Colorado, and wrap-up the settlement quickly. We, obviously, will agree that the money will be paid directly to you, with the balance due Starla paid to her. Time is critical, and I would appreciate your responding as soon as possible.

Sincerely,

Charles N. Parnell, III

map

cc:   Ms. Starla Price
      8121 Long Needle Place
      Montgomery, Alabama 36117

# SAMFORD & DePAOLA, P.C.
## ATTORNEYS & COUNSELORS AT LAW

William James Samford, Jr.*
Susan Shirock DePaola

One Commerce Street • Suite 601
Montgomery, Alabama 36104
Telephone (334) 262-1600
Facsimile (334) 262-1638

*Also Admitted in D.C.

TO:   Von Memory          Fax: 834-8001

FILE NO.: Price

FROM:  Susan Shirock DePaola

Von,   Take a look at this and let me know what you think. I have not received a motion appointing you to serve as attorney for the Trustee--SSD