# EXHIBIT H

# Price Rule 2004 examination

### Page 1

1  UNITED STATES BANKRUPTCY COURT
2  MIDDLE DISTRICT OF ALABAMA
3
4  IN RE: Stephen L. Price, Debtor.
5      Case No. 02-30767
6      Chapter 7
7
8  * * * * * *
9
10
11 DEPOSITION OF STEPHEN PRICE,
12 taken pursuant to notice and stipulation in
13 the Law Offices of Von Memory, 469 South
14 McDonough Street, Montgomery, Alabama,
15 before Nicole Paulk, Court Reporter and
16 Notary Public in and for the State of
17 Alabama at Large, on October 2nd, 2002,
18 commencing at approximately 3:28 p.m.
19
20
21
22
23

### Page 2

1           APPEARANCES
2
3  ON BEHALF OF STEPHEN PRICE:
4      CHARLES N. PARNELL, ESQUIRE
5      Parnell & Crum
6      641 South Lawrence Street
7      Montgomery, Alabama  36102
8
9  TRUSTEE:
10     SUSAN SHIROCK DePAOLA, ESQUIRE
11     One Commerce Street
12     Suite 601
13     Montgomery, Alabama  36104
14
15
16 REPRESENTING TRUST BANK:
17     VON G. MEMORY, ESQUIRE
18     469 South McDonough Street
19     Montgomery, Alabama  36104
20
21
22
23

### Page 3

1           STIPULATIONS
2      It is stipulated and agreed by and
3  between counsel representing the parties
4  that the deposition of STEPHEN PRICE may be
5  taken before Nicole Paulk, Court Reporter
6  and Notary Public in and for the State of
7  Alabama at Large, without the formality of
8  a commission; and all formality with
9  respect to other procedural requirements is
10 waived; that objections to questions, other
11 than objections as to the form of the
12 questions, need not be made at this time
13 but may be reserved for a ruling at such
14 time as the deposition may be offered in
15 evidence or used for any other purpose by
16 either party as provided by the Federal
17 Rules of Civil Procedure.
18     It is further stipulated and
19 agreed by and between the parties hereto
20 and the witness that the signature of the
21 witness to this deposition is hereby
22 waived.
23 INDEX

### Page 4

1  EXAMINATION              PAGE
2  By Ms. DePaola . . . . . . . .   4
3  By Mr. Memory . . . . . . . .  32
4  By Ms. DePaola . . . . . . . .  50
5      (No exhibits were marked to this
6       deposition.)
7
8  * * * * * *
9
10     STEPHEN PRICE, of lawful age,
11 having first been duly sworn, testified as
12 follows:
13 EXAMINATION
14 BY MS. DePAOLA:
15 Q.  Would you state your name, please.
16 A.  Stephen Price.
17 Q.  And what's your current address, Mr. Price?
18 A.  It's 2332 Carter Hill Road.
19 Q.  Is that an apartment?
20 A.  Yes, ma'am.
21 Q.  What's the apartment number?
22 A.  Well, it's a duplex.
23 Q.  Okay. Is that sufficient to get mail to

Page 5

1  you without an A or B or --
2  A.  Yes, yes.
3  Q.  Okay. And that's 3611 --
4  A.  111.
5  Q.  And how long have you been living there?
6  A.  Well, I'm just moving in today.
7  Q.  Where were you living prior to that?
8  A.  With my father.
9  Q.  And where is that?
10 A.  In Ramer.
11 Q.  I had understood you were working out of
12 state; is that true?
13 A.  I was looking at going out of state, and
14 that didn't work out.
15 Q.  All right. Have you had any employment
16 since the 341 hearing, since the last time
17 you've appeared in this case?
18 A.  No, ma'am.
19 Q.  So when was the last time you were
20 employed?
21 A.  It would have been when I left Capital
22 City. Well, let's see. When was it? We
23 went over this the last time.

Page 6

1  MR. PARNELL: About the time the
2  case converted, which would
3  have been March, I believe.
4  A.  In March.
5  Q.  Okay. And is Capital City Mr. Watson's
6  company?
7  A.  Yes, ma'am.
8  Q.  Okay. I want to go back over some dates
9  that you gave us at the 341 hearing. And I
10 brought you a calendar today --
11 A.  Okay.
12 Q.  -- to see if that would assist you. First
13 of all, tell me what -- this isn't on the
14 calendar -- what year did your mother die?
15 A.  1996.
16 Q.  Okay. And is that when you began working
17 or acquired the company Cross Country
18 Freight?
19 A.  No, that was formed in 1998.
20 Q.  Okay. What did you do from 1996 to 1998?
21 A.  I had a company called Stephen Price Motor
22 Lines that I had been running.
23 Q.  What happened to that company?

Page 7

1  A.  Well, I -- I guess it just kind of
2  dissolved itself, and then I took some of
3  the equipment from that company and started
4  Cross Country with that.
5  Q.  Okay. And then, as I understand it, that
6  was in approximately 1998?
7  A.  Yes, ma'am.
8  Q.  All right. And that company was based in
9  Illinois; am I correct?
10 A.  That is correct.
11 Q.  Okay. And tell me how you came to go to
12 Illinois.
13 A.  I was looking for a company to lease some
14 trucks to, you know, because I had these
15 trucks that I needed to put them on with a
16 company, and I got in contact with a
17 company called Landstar Inway out of
18 Rockford, Illinois, and then they referred
19 me to agents of theirs that were based out
20 of Illinois, and so that's where I met
21 them.
22 Q.  What's the name of that company they
23 referred you to?

Page 8

1  A.  No, they were agents of Landstar Inway.
2  Q.  Is this Anna Cantrell?
3  A.  Right.
4  Q.  Okay. And so you formed this corporation
5  in what year?
6  A.  '98.
7  Q.  Okay. And as I understand it, you owned
8  part of the stock; Starla Price owned part
9  of the stock; Anna Cantrell?
10 A.  Correct.
11 Q.  Anybody else?
12 A.  No, that's it.
13 Q.  And it operated out of Illinois -- this is
14 the part I want you to look at the calendar
15 and, to the best of your ability, tell
16 me --
17 A.  Okay.
18 Q.  -- how long the company remained operating
19 out of Illinois.
20 A.  Would have been from its inception in '98
21 until -- my best recollection is August or
22 September of '01.
23 Q.  I had understood that you had operated the

Page 9

1  company through an entity in Louisiana for
2  some period of time; am I incorrect in
3  that?
4  A.  Well, up until that point in August or
5  September, after that fact, then it was
6  operated out of Lafayette, Louisiana.
7  Q.  So it's your testimony that operations in
8  Louisiana were from September of 2001 -- is
9  that right -- until what date?
10 A.  It was maybe a month to six weeks, would be
11 my best guess.
12 Q.  Four weeks --
13 MR. PARNELL: It was longer than
14 that.
15 MS. DePAOLA: I'm sorry.
16 MR. PARNELL: You didn't move the
17 equipment here until November
18 the 10th, I don't believe. I
19 thought it was about 90 days.
20 THE WITNESS: Out of Louisiana?
21 MR. PARNELL: But you need to
22 testify.
23 A.  Well, it was -- you know, it took a while

Page 10

1  to move it from Illinois to Louisiana, and
2  then we moved it from Louisiana to Alabama
3  fairly quickly, because I had to move it to
4  try to get the trucks in a profitable
5  situation.
6  Q.  You filed a Chapter 11 in this case in
7  November of 2001. Does that assist you in
8  recollecting how long you were here before
9  you filed?
10 A.  I think we were here just prior to that.
11 Q.  How long -- how long?
12 A.  How long were --
13 Q.  -- were you here?
14 A.  -- the trucks in Alabama prior to the
15 bankruptcy?
16 Q.  Yes.
17 A.  I think I'm right.
18 THE WITNESS: No? All right.
19 A.  A few weeks, then. Anyway, to understand
20 the chronological order --
21    (Brief interruption.)
22 MR. MEMORY: Go ahead, Susan.
23 Q.  Go ahead.

Page 11

1  A.  -- Cross Country was in Illinois from its
2  inception in '98 to August '01; then it
3  moved to Lafayette August through October;
4  then it moved to Alabama in November.
5  Q.  Now, Charles Wooten, I think his name is --
6  A.  Yes, ma'am.
7  Q.  -- is an attorney somewhere in Louisiana;
8  is that right?
9  A.  Yes, ma'am.
10 Q.  Did you go to see him about a bankruptcy
11 proceeding?
12 A.  Yes, ma'am.
13 Q.  All right. And I'm assuming that since you
14 were in -- your testimony is you were in
15 Louisiana August through October; is that
16 right?
17 A.  Yes, ma'am.
18 Q.  And when did you go see him?
19 A.  Just a few weeks prior to moving from
20 Louisiana.
21 Q.  So you went to see him, and you're saying
22 in September; is that your testimony?
23 A.  Could have been September. It could have

Page 12

1  been September or October, correct.
2  Q.  All right. Who went with you in that
3  meeting?
4  A.  Richard Buswell.
5  Q.  Who else?
6  A.  That's it.
7  Q.  Starla Price --
8  A.  No.
9  Q.  -- did not attend the meeting?
10 A.  No.
11 Q.  All right. How about Bonnie Buswell?
12 A.  No, ma'am.
13 Q.  Was Starla Price ever in Louisiana?
14 A.  No, ma'am.
15 Q.  Was any money paid to Mr. Wooten?
16 A.  Yes.
17 Q.  How much?
18 A.  $25,000.
19 Q.  And where did that money come from?
20 A.  From a company called -- company called Ace
21 that the trucks were leased to.
22 Q.  Who's Ace? I mean, you'll have to flesh
23 that out for me.

Page 13

1   A.   Ace is a company that the trucks were
2   leased to -- the trucks from Cross Country
3   were leased --
4   Q.   Whose company was it?
5   A.   Who owned the company?
6   Q.   Yeah.
7   A.   I don't know.
8   Q.   Why would Ace pay $25,000 for the Cross
9   Country bankruptcy?
10  A.   That's a good question. They advanced
11  money, and in order to pay Charles Wooten,
12  Richard Buswell arranged to get money from
13  Ace to give it to Charles.
14  MR. PARNELL:  Susan, it could have
15  been monies that Ace owed
16  Cross Country under an
17  operating agreement. We
18  don't know. We couldn't get
19  records from Ace. I suspect
20  that may have been what it
21  was, but I don't know that
22  for a fact.
23  A.   It wouldn't surprise me, because I can tell

Page 14

1   you for a fact, whenever I got my
2   settlement from Ace, it would always go to
3   zero, meaning there was no money left over
4   after paying drivers and fuel.
5   Q.   Is it your testimony you don't know who
6   owned Ace?
7   A.   There's a guy that I talked to that was in
8   operations -- I can't recall his name.
9   Q.   And is it your testimony that Ace paid all
10  of the money, the $25,000, on your behalf?
11  A.   Well, that's where it came from.
12  Q.   Is that a yes?
13  A.   As far as I can recall, that's where the
14  money came from.
15  Q.   Is it correct that the check was delivered
16  to Mr. Wooten on the day that you met with
17  him -- that you took a check with you?
18  A.   Richard Buswell brought a check. I do
19  remember that.
20  Q.   All right. So I would assume that whatever
21  date was on the check would be the date you
22  met with him or close to it; is that a fair
23  assumption?

Page 15

1   A.   I would think so, yes, ma'am.
2   Q.   And Starla Price was not with you, you
3   said, just you and Richard Buswell; is that
4   correct?
5   A.   Right.
6   Q.   Okay. Did Mr. Wooten draw up any documents
7   for a bankruptcy?
8   A.   No, ma'am.
9   Q.   Well, I mean, what did he do for the
10  $25,000, to your knowledge?
11  A.   Well, he supposedly spoke with creditors,
12  spoke with people that were saying they
13  were owed money or in -- behind. If, you
14  know, whether it was drivers or trailer or
15  tractor, creditors, and he would speak with
16  them and tell them that, working on a -- I
17  think a work out, I think's what he called
18  it, you know, to work everything out
19  without going through a bankruptcy.
20  Q.   Okay. So you were paying him $25,000 to
21  not put you into bankruptcy; is that what
22  you're saying?
23  A.   Well, what happened was, you -- he was

Page 16

1   given this money, and then, you know,
2   you're supposed to have it like on record
3   or trust or, you know, and he draws from
4   it. So then I remember when I went to go
5   meet with him one time to ask about these
6   things, and I said, you know, doesn't look
7   like this work out's working out, or, you
8   know, we're not getting anywhere. And I
9   said, how much money have I got left over?
10  And he said, it's all gone. And that's
11  where I was floored, that he had -- you
12  know, what I'm saying is, he didn't do
13  $25,000 worth of work.
14  Q.   Who did you live with in Louisiana?
15  A.   I stayed at an extended stay for part of
16  the time, and then I stayed in an apartment
17  for part of the time.
18  Q.   Did you live with anyone else?
19  A.   No, ma'am.
20  Q.   What made you decide to leave Louisiana?
21  A.   Really the -- I guess it was that deal with
22  Charles Wooten. I could tell that he
23  wasn't trustworthy, and plus, I wasn't

Page 17

1  making any money. I just saw the writing
2  on the wall, and I just saw that it was --
3  it was just going to eat money, so I had to
4  get away from it.
5  Q. And you brought the -- did you bring the
6  trucks back, or, I mean -- were you still
7  in charge of them when they came back to
8  Montgomery, or was Starla Price then in
9  charge of them?
10 A. No. I was in charge of them.
11 Q. Because I noticed in your divorce
12 settlement, it says that if the company's
13 not making money and you're not making
14 payments, that Starla gets to be in charge
15 of the trucks. Is that a fair summary?
16 A. Yes, ma'am.
17 Q. Did she take over the trucks?
18 A. No. I was running them. But I mean, I was
19 bringing them to Montgomery, and then
20 that's how I got onto Capital City.
21 Q. So you brought them to Montgomery and
22 turned them over to her father's company --
23 Starla's father's company?

Page 18

1  A. Right.
2  Q. Okay. And did you go to work for the
3  company?
4  A. I did work there.
5  Q. For Capital City, I mean. Did you become
6  an employee of --
7  A. No, I was working with Cross Country.
8  Q. Okay. So Cross Country maintained some
9  separate books and records?
10 A. Through the bankruptcy, sure.
11 Q. Where are those records?
12 A. Well, Jackson, Thornton did the bankruptcy
13 work, so they would have records.
14 Q. Are all of the records of Cross Country at
15 Jackson, Thornton?
16 A. Well, I probably have some bank statements,
17 but --
18 Q. How many trucks are we talking about?
19 A. If you're talking about reconciled monthly
20 statements, Jackson, Thornton did that.
21 Q. No. I'm talking about all of the financial
22 records of Cross Country.
23 A. It would be at Capital City, because

Page 19

1  everything was run through Capital City.
2  Q. What do you mean, "run through"?
3  A. That's how Cross Country got paid.
4  Q. Okay.
5  MR. PARNELL: The trucks were
6  operated under the ICC
7  authority. In essence, they
8  were leased from Capital --
9  from Cross Country to Capital
10 City, and Capital City
11 allowed the trucks to run
12 under their authority,
13 collecting the revenues,
14 and split the revenues 78/22
15 or whatever -- whatever the
16 formula --
17 A. Yeah. There's a weekly settlement showing
18 the revenue produced by the truck --
19 Q. Where are those documents?
20 A. They're at Capital City.
21 Q. And you have access to those?
22 A. Yeah, I could get them.
23 Q. Okay. I want to get this clear. Were you

Page 20

1  paid any salary from any entity after you
2  came back to Montgomery?
3  A. I was getting paid through Cross Country.
4  Q. Okay. So Cross Country was getting the
5  28 percent of the revenue or the 70
6  percent, which was it?
7  A. The 70 -- 78.
8  Q. Cross Country was getting 78 percent of the
9  revenues. Were you managing -- you know,
10 paying the creditors, paying the notes?
11 A. Right.
12 Q. You personally were doing that?
13 A. Well, you know, we were under bankruptcy,
14 so I was, you know, still dealing with the
15 bankruptcy --
16 Q. And you were being paid a salary by Cross
17 Country?
18 A. Right.
19 Q. How much?
20 A. It was, I think, 1200 a week.
21 Q. Was Starla Price paid a salary from either
22 of these entities, to your knowledge?
23 A. She was getting paid by Capital City.

Page 21

1  Q.  Was this for her ownership interest in
2  Cross Country, or was she down there
3  working or what?
4  A.  Well, yeah. I mean she worked some, but I
5  think there was -- you know, it was worked
6  out where she would get, you know, some
7  revenue dollars or, I guess, basically
8  income from the operation of the trucks.
9  Q.  From the operation of Cross Country?
10 A.  Of Cross Country's trucks.
11 Q.  So in -- okay. But she was being paid
12 through the father's company rather than
13 out of your Cross Country money; is that
14 correct?
15 A.  I believe that's correct, yes, ma'am.
16 Q.  Now, were you also paying her the 12,000 a
17 month property settlement outlined in your
18 divorce decree?
19 A.  No, ma'am.
20 Q.  How was that being paid?
21 A.  That was paid through Capital City.
22 Q.  So the property settlement of $12,000 was
23 what she was getting from Capital City; is

Page 22

1  that correct?
2  A.  Right.
3  Q.  Is she still getting that from Capital
4  City?
5  A.  As far as I know.
6  Q.  And I assume that's not for the operation
7  of Cross Country Freightline Trucks
8  anymore; is that right?
9  MR. PARNELL:  They're all gone.
10 Q.  I mean -- they're all gone?
11 A.  Well, like I said, you know, I don't know
12 what they're doing right now, but, I mean,
13 I know that her dad is running the trucking
14 company; I'm removed entirely from it.
15 Q.  Are you making your property settlement
16 payments of $12,000 a month?
17 A.  No, ma'am.
18 Q.  It's my understanding from your testimony
19 those are being paid by her father's
20 trucking company?
21 A.  Well, in actuality, the property settlement
22 was part of my bankruptcy.
23 Q.  Just answer my question. Are the $12,000

Page 23

1  monthly payments still being made through
2  Mr. Watson's trucking company?
3  MR. PARNELL:  If you know.
4  A.  I don't know how much she's getting, but I
5  do know that her income is coming from
6  Capital City.
7  Q.  Okay. When your mother died in 1996, did
8  you say --
9  A.  Yes, ma'am.
10 Q.  -- tell me specifically what you -- did she
11 have a will?
12 A.  Yes.
13 Q.  Okay. And pursuant to that will, you were
14 to receive what?
15 A.  Well, I was the only child, so I got -- I
16 got what she had.
17 Q.  All right. Could you please explain that,
18 what it -- what that was?
19 A.  You just want an overview, or you want item
20 by item?
21 Q.  Well, we'll just try the overview first and
22 then...
23 A.  Well, let's see. She had accounts, you

Page 24

1  know, brokerage accounts.
2  Q.  Okay. Do you have an estimate of the total
3  value of those?
4  A.  I think the total value -- I guess the best
5  thing I can do is, I can give you a total
6  value of everything after everything was
7  done, you know, not item by item by
8  personal possession, but -- you want to
9  know the total amount of money that I
10 received?
11 Q.  I want to know the total value of
12 everything you received -- cash, accounts,
13 jewelry, furniture, yes, the total
14 distribution to you from the estate.
15 A.  Okay. Plus the estate taxes or after or
16 what?
17 Q.  Before.
18 A.  Before estate taxes?
19 Q.  Uh-huh.
20 A.  I think it was probably a total of about
21 $1.6 million.
22 Q.  Okay. And as I understand it, of that 1.6
23 million, you had estimated that $500,000

Page 25

1  worth of that was furnishings; is that
2  true?
3  A.  Oh, are you talking about on the divorce
4  decree?
5  Q.  I'm talking about -- well, you just tell
6  me. Break it down for me. What's the 1.6
7  million?
8  A.  Well, I had to pay about 500,000 in estate
9  taxes, so it left between 1.1 and 1.2. And
10  as far as the -- you know, there was some
11  jewelry, and I think we've been over that,
12  but, you know, the numbers that were put on
13  the divorce were inflated for my purposes
14  in the divorce in Colorado, because divorce
15  law in Colorado is a lot better for the man
16  than it is in Alabama.
17  Q.  Are you saying you inflated the value of
18  the jewelry when you filed for divorce in
19  Colorado?
20  A.  No. I'm saying that's what my attorney put
21  down, because he was trying to say that --
22  it was just, you know, posturing that, you
23  know, the more that I brought into the

Page 26

1  marriage, the more I'd be able to keep.
2  Q.  Okay. I can't recall right now, but it
3  seemed like the figure was around $100,000;
4  is that right?
5  A.  For what?
6  Q.  Jewelry.
7  A.  It could have been. I don't know if it was
8  that much, though.
9  Q.  Okay. What else --
10  A.  But the furniture was not 500,000.
11  Q.  You put in the divorce decree 500,000?
12  A.  If that's what it said, that's what was put
13  down.
14  Q.  What else?
15  MR. PARNELL: What else did he
16  inherit?
17  MS. DePAOLA: He's breaking down
18  the 1.6 million for me.
19  MR. PARNELL: Just go through real
20  estate, stock accounts, cash,
21  furniture. Can you do that
22  for her?
23  A.  Yeah. The rest would have been probably

Page 27

1  800,000 in cash.
2  Q.  Anything else?
3  A.  That would probably be it after the taxes
4  were paid.
5  Q.  Okay. Now, as I understand it, the jewelry
6  and furniture that you inherited from your
7  mother are the items that were transferred
8  to Starla in the settlement agreement?
9  A.  Yes, ma'am.
10  Q.  Is that correct?
11  A.  Uh-huh.
12  Q.  Tell us what happened to the $800,000.
13  A.  Let's see. 400,000 was put into the house
14  in Steamboat Springs.
15  Q.  As I understand it, your interest in that
16  house was transferred to Starla in the
17  divorce?
18  A.  That's correct.
19  Q.  Okay.
20  A.  250,000 was put into the Cross Country.
21  And the rest was spent.
22  Q.  Just for living expenses?
23  A.  Yes, ma'am.

Page 28

1  Q.  How are you supporting yourself at this
2  time?
3  A.  Well, that -- I don't know if you know, but
4  that's one of the reasons that we had to
5  move this, is that I've got a job interview
6  that I'm looking at securing.
7  Q.  But I mean up to now. How have you been
8  supporting yourself since last March?
9  A.  I've been living with my dad.
10  Q.  Oh, okay. Where is Mr. Watson's trucking
11  company located?
12  A.  It's on Furnace Street off of Northern
13  Boulevard.
14  Q.  In the property on Longneedle -- is that
15  where your ex-wife lives?
16  A.  Yes, ma'am.
17  Q.  All right. Am I correct that was a
18  lease/purchase agreement?
19  A.  Yes, ma'am.
20  Q.  Am I correct that you are on that
21  lease/purchase agreement?
22  A.  No, ma'am.
23  Q.  Okay. Who is that -- who are you

Page 29

1  purchasing it from -- or I'm sorry, who is
2  your ex-wife purchasing it from?
3  MR. MEMORY: Lloyds.
4  THE WITNESS: Yeah.
5       (Off-the-record discussion.)
6  Q.  What's the first name; do you know?
7  MR. MEMORY: Kurt, K-U-R-T.
8  A.  Kurt Lloyd, that's right.
9       (Off-the-record discussion.)
10 Q.  Am I correct that you filed for divorce in
11 Colorado in approximately March of 2001; is
12 that right?
13 A.  February.
14 Q.  February. There's a reference in some
15 of -- one of these documents to the parties
16 having a lease -- lease/purchase agreement
17 for the property in Montgomery; is that
18 inaccurate if that's in here?
19 A.  Who's got a lease/purchase agreement?
20 Q.  It says the parties, presumably you and
21 Starla Price, if it's the divorce
22 documents.
23 A.  I wouldn't have one.

Page 30

1  Q.  All right. So your name has never been on
2  a lease/purchase --
3  A.  No, ma'am.
4  Q.  And when you filed this petition, it
5  indicated that the business was operating
6  on Woodvale Avenue in Lafayette, Louisiana.
7  I guess, is that -- that was not accurate?
8  They were -- you had already moved here?
9  A.  What are you looking at? What -- what is
10 this?
11 Q.  The petition that you filed in --
12 A.  Is that bankruptcy?
13 Q.  Uh-huh.
14 A.  Well, that's where the trucks were, you
15 know, prior to Montgomery.
16 Q.  But in November you're saying they were
17 here?
18 A.  Right.
19 Q.  Okay. When were you negotiating with Chip
20 Hollingsworth in Illinois about the
21 purchase of your company?
22 A.  Let's see. Chip came -- went up to
23 Illinois -- it was in the -- I'd say the

Page 31

1  spring of '01.
2  Q.  Okay. Is that when you first talked with
3  Richard Buswell about your company?
4  A.  No, ma'am. I -- actually, I think Chip had
5  come up there with some other guy, and they
6  had talked to my partners for -- at length
7  for going on several -- I guess a couple
8  months. But I guess in an indirect way,
9  that's how I met Richard Buswell, later on
10 that year.
11 Q.  Did you go to Donnell Trucking to look over
12 that business?
13 A.  Yeah. But that's -- he had -- well,
14 Donnell had a building in south Alabama.
15 Q.  Uh-huh.
16 A.  And that's actually where I did meet
17 Richard Buswell.
18 Q.  When did you go there?
19 A.  My best guess would be June.
20 Q.  And did Starla Price go there in June with
21 you?
22 A.  To Donnell? Yes.
23 Q.  I'm sorry?

Page 32

1  A.  I think -- yes. I know -- I know Doug did.
2  I believe she did.
3  Q.  I think that's all the questions I have.
4  EXAMINATION
5  BY MR. MEMORY:
6  Q.  Mr. Price, I asked you some questions at
7  the 341 meeting. I don't know if -- I
8  don't think it was -- and you didn't have
9  documents with you at that time, and then
10 as part of Rule 2004 examination, I asked
11 you to bring some documents with you. Did
12 you bring any documents with you?
13 A.  I had given the information to Laura and
14 she had made copies.
15 THE WITNESS: Do you have those?
16 MR. PARNELL: Laura is my
17 paralegal. No. I thought we
18 had sent you everything.
19 MR. MEMORY: Not saying you
20 didn't, but I don't remember
21 anything.
22 A.  All right. Yeah. Yeah, here it is. You
23 talking about for the house and that

Page 33

1 type --
2 Q. Yeah.
3 A. You want that?
4 Q. Please.
5 A. All right. Do you just want this file?
6 Q. Is that all right?
7 MR. PARNELL: Yes, sir.
8 Q. What was the purchase price of the home?
9 A. The house in Steamboat when it was sold?
10 Q. Steamboat Springs when you purchased it.
11 A. When I purchased it?
12 Q. Yes, sir.
13 A. I paid 1.25 million.
14 Q. I just learned for the first time that you
15 put some of your own money in that; is that
16 right or wrong?
17 A. That's correct.
18 Q. And how much did you put in?
19 A. About $400,000.
20 Q. And that came from your mother's estate?
21 A. That's correct.
22 Q. Did you put any other money in it from
23 anywhere else?

Page 34

1 A. No, sir.
2 Q. Your bankruptcy papers show that you were
3 making in the -- substantial sums of money.
4 Why did you choose to put your mother's
5 money in it as opposed to earnings from the
6 company?
7 A. I didn't even have the company when I
8 bought the house.
9 Q. When did you buy the house?
10 A. Well, I built it starting in '96 through
11 '97.
12 Q. Okay. Maybe I'm wrong. Did you purchase a
13 lot?
14 A. Yes.
15 Q. And then you constructed a home?
16 A. That's correct.
17 Q. Is that right?
18 A. Right.
19 Q. Who is your builder?
20 A. Lindal Cedar Homes.
21 Q. And after everything was said and -- well,
22 before -- how much did it cost you for the
23 lot?

Page 35

1 A. 325.
2 Q. And how many acres?
3 A. Ten acres.
4 Q. Did you ever sell any of that off?
5 A. No, sir.
6 Q. And then construction started. Did you get
7 a construction-type loan --
8 A. Yes.
9 Q. -- or did you put your own money in it?
10 A. Got a -- I got a loan, construction loan,
11 and then converted it to a permanent.
12 Q. How much was your construction loan?
13 A. Well, it progressed, you know, as you --
14 Q. Well, was it an amount that supposedly you
15 borrowed and, I guess, you could draw
16 against that amount?
17 A. Uh-huh.
18 Q. What was the amount that you --
19 A. I think it ended up being about 800,000 --
20 a little over 800,000.
21 Q. Okay. So you could draw down up to 800,
22 plus or minus, thousand dollars; is that
23 right or wrong?

Page 36

1 A. I believe that's right.
2 Q. What bank?
3 A. Chase Manhattan.
4 Q. With an office in Steamboat Springs or
5 somewhere else?
6 A. No. It was out of the state.
7 Q. Okay. Did they take a deed in trust or a
8 mortgage?
9 A. I don't -- I don't know. I don't
10 understand. They had the mortgage.
11 Q. That's my question.
12 A. Yes.
13 Q. Did they take a mortgage?
14 A. Chase Manhattan? Yeah.
15 Q. Okay. Was there any other mortgages or
16 liens against the property other than the
17 first to Chase Manhattan?
18 A. No, sir.
19 Q. So if I understand -- okay. Did that loan
20 include the purchase of the lot, or did you
21 buy the lot out of your ready proceeds?
22 A. If I recall correctly, I went ahead and
23 bought the lot, and then that -- but that

Page 37

1  counted as equity in the entire house and
2  land, and that's where I got the balance of
3  the money was from the construction loan
4  that turned into permanent.
5  Q.   Okay. The way it ended up, however, you
6  owed a total of 1.2 million; is that
7  correct?
8  A.   Correct.
9  Q.   And who did the permanent financing on the
10 home?
11 A.   Chase Manhattan.
12 Q.   So did you do one loan, or did you have to
13 do a new closing for permanent financing?
14 A.   I think it was a pretty fluid transaction,
15 so I don't know that I had to do another
16 closing.
17 Q.   Okay. And where was the office of Chase
18 Manhattan?
19 A.   That I do not recall.
20 Q.   Where were you sending your money, sending
21 your papers?
22 A.   Yeah. I just haven't done it in so long.
23 I -- I know I've been asked that question.

Page 38

1  Because the closing and everything was done
2  in Steamboat at the title company.
3  Q.   Okay. Now, the home was completed when?
4  A.   I think it was about Halloween of '97.
5  Q.   And then you sold the home when?
6  A.   The house was sold September of '01.
7  Q.   Did anyone do an appraisal on the home,
8  either as-built type of appraisal before
9  you borrowed the money, or did an appraisal
10 get done after you had it built?
11 A.   Not that I'm aware of.
12 Q.   Now, how would we -- what documents have
13 you got access to that would tell us who
14 did the loan, the address for Chase
15 Manhattan?
16 A.   Quite honestly, I haven't looked at what
17 you're looking at, so I --
18 Q.   It's not here is the reason I'm asking.
19 It's not in this file.
20 A.   Okay. So you're asking --
21 Q.   I'm asking --
22 A.   -- about the loan documents with Chase?
23 Q.   In my opinion there's an appraisal in some

Page 39

1  file some place --
2  A.   Okay.
3  Q.   -- and that's what I'm trying to find.
4  A.   Quite honestly, if it exists, it would be
5  with the furnishings of the house which my
6  ex-wife would have.
7  Q.   Okay. Now my follow-up question is,
8  assuming we couldn't get it from that area,
9  how could I locate someone with Chase
10 Manhattan to ask them? That's why I go
11 back to the question as to where were you
12 sending your papers; who's the loan
13 officer; who's the contact person that
14 would have that loan file?
15 A.   Well, like I said, I don't see why you
16 couldn't get it from my ex-wife or someone
17 couldn't. They would have to be -- because
18 I mean, my desk that I did all my paperwork
19 is in my ex-wife's house.
20 Q.   Right.
21 A.   And all my records from every stub that I
22 wrote a check to Chase Manhattan is in
23 there.

Page 40

1  Q.   Starla's got it?
2  A.   That's correct.
3  Q.   On Longneedle?
4  A.   That's correct.
5  MR. PARNELL: Stephen, do you have
6  any recall of what office you
7  dealt with, was it in Denver
8  or -- do you have any recall
9  about that, that you can
10 share with Mr. Memory?
11 THE WITNESS: It would be a stab
12 in the dark, but, I mean, for
13 some reason, Illinois comes
14 to mind.
15 MR. PARNELL: Okay.
16 MS. DePAOLA: But I -- you know,
17 it's just a stab.
18 Q.   I mean, how did you find out about these
19 people?
20 A.   About Chase Manhattan?
21 Q.   Uh-huh.
22 A.   I think it was just, you know, recommended
23 from my real estate agent or through a

Page 41

1  realtor or through the title company.
2  Q. But you're saying that Starla Price would
3  have that information?
4  A. If anybody does --
5  Q. Contact people?
6  A. -- yeah, I mean, because it was in with the
7  company. I mean, it's not like I don't
8  keep records, but I just -- I don't have
9  them.
10 Q. Okay. So if you've got any personal
11 documents, they're either over at Watson or
12 with Starla; is that right?
13 A. That's correct.
14 Q. Now, what was the home sold for in -- you
15 said '01? I don't remember the date, but
16 did you say Halloween of '01?
17 A. September of '01.
18 Q. Okay. How much was it sold for?
19 A. My best guess, it was about 1.2. I really
20 don't know. I wasn't involved in...
21 Q. And what was the mortgage balance?
22 A. 775.
23 Q. Roughly, how much commission did you get

Page 42

1  charged to have it sold?
2  A. I don't know.
3  Q. Where are the loan closing documents?
4  A. Starla would have them.
5  MR. PARNELL: Von, it sold at
6  auction, from what I
7  understand.
8  MR. MEMORY: Foreclosure?
9  MR. PARNELL: No.
10 Q. What type of sale?
11 A. Absolute.
12 Q. I mean, was it just, it couldn't be sold,
13 and somebody just put it on the market?
14 A. You know, the -- this is where the rub
15 comes. I mean, that house was worth a
16 whole lot more money, and it was sold the
17 week of September 11th at absolute auction,
18 okay, like a few days right after that. So
19 that's what caused the house to be sold at
20 such a -- what I consider a 50 percent
21 discount. That house is worth twice that
22 any given day of the week, so, you know,
23 I'm not at liberty to tell you why she sold

Page 43

1  it at absolute or why she did it at that
2  time, why it wasn't postponed; I don't
3  know. All I know is that house is worth a
4  lot more than it sold for.
5  Q. Why do you say that?
6  A. Because everybody in Steamboat knew that,
7  said that, told us that, and it was -- to
8  any other house comparable, it, you know,
9  measured right up to it.
10 Q. At what point did you deed your interest or
11 convey your interest in the home to Starla?
12 A. It would have been right after the divorce.
13 Q. And that would have been --
14 A. We divorced on August 8, so then, within 30
15 days of that.
16 Q. August 8 of what year?
17 A. '01.
18 MR. PARNELL: I think the decree
19 itself did that if I'm not
20 mistaken. You may want to
21 look at that.
22 Q. Now, there is -- do you know a William C.
23 Hibbard, H-I-B-B-A-R-D?

Page 44

1  A. I've heard the name.
2  Q. Well, he wrote a little nasty letter to the
3  trustee saying that, don't look to him for
4  or that his clients to any money. He
5  claims --
6  MR. PARNELL: Stephen, he's the
7  attorney for Great Plains in
8  Colorado, I believe.
9  Q. Well, it says, my client, Great Plains --
10 who is Great Plains?
11 A. That was a factoring company that Cross
12 Country used to -- and sell their
13 receivables for advance money.
14 Q. Cross Country was factoring with them?
15 A. Correct.
16 Q. And you gave a personal guaranty?
17 A. That's correct.
18 Q. Did Starla give a guaranty?
19 A. Yes.
20 Q. Okay. So Chase held the first for about
21 775; right?
22 A. Right.
23 Q. And then did Great Plains get a judgment

Page 45

1  against you?
2  A.  From what I understand, they -- they got a
3  bond somehow, put a bond up and tied down X
4  amount of money that they, I guess, were
5  preparing to sue for.
6  MS. DePAOLA:  From the proceeds of
7  the house?
8  THE WITNESS:  Yes.
9  MR. PARNELL:  We did a prejudgment
10 attachment.
11 Q.  Is that case still going on?
12 A.  As far as I know.
13 Q.  Is that lawsuit pending in Colorado or
14 Alabama?
15 A.  I think it's in Colorado.
16 Q.  Okay.  So they don't have anything.  All
17 they've got is a bond and that -- so
18 there's some money, the difference between
19 the 775 and any closing expenses is still
20 being held in an account, in an escrow type
21 of account; is that right?
22 A.  Yeah.  They -- is that information in
23 there, from Great Plains?  Because that

Page 46

1  should --
2  Q.  I haven't seen it.  It may be, and I'm
3  going to look through it, but I'm not going
4  to waste our time today looking through it.
5  A.  Yeah, they've tied down --
6  MR. PARNELL:  $260,000.
7  THE WITNESS:  Yeah.  That's what
8  they -- I guess they sued for
9  it, didn't they?
10 A.  Then they went this roundabout way of tying
11 the money down.  I don't know how they did
12 it or what -- you know, how that
13 transpired, but, yeah.
14 Q.  So 260 was left for you and Starla -- or
15 for Starla?
16 A.  For Starla, but yeah, it's just -- I don't
17 know where it is.  But it's sitting
18 somewhere.
19 Q.  Okay.  Do you know, is there anything else
20 about that lawsuit that you know or that
21 you can shed light on?
22 A.  All I know is Great Plains is hanging in
23 there, you know, fighting for it.

Page 47

1  Q.  Do you have a lawyer in that case?
2  A.  No, sir.
3  Q.  Who is Ingalls & Ingalls?
4  A.  That was my accounting firm in Steamboat.
5  Q.  Did you ever have a lawyer in that case?
6  A.  What case?
7  Q.  The case where you were sued by Great
8  Plains?
9  A.  Oh, no.
10 Q.  Were you sued by Great Plains?
11 A.  I think I was named.
12 Q.  Okay.  But you never got a lawyer?
13 A.  No, sir.
14 Q.  Okay.  And then you filed your Chapter 11
15 when?
16 A.  It was November.
17 Q.  Do you know who the sales company was that
18 auctioned the property off?
19 A.  National Auction Group.  They're out of
20 Gadsden, Alabama.
21 Q.  And this home sold September 12th?  13th?
22 14th?
23 A.  I think it was the 20th.

Page 48

1  Q.  And so if I'm understanding the sequences,
2  Starla Price, incident to a divorce decree,
3  got the property around August 8th, put the
4  home up for sale, and it sold around
5  September 20th?
6  A.  Correct.
7  Q.  Was this a case that the divorce, did it --
8  was it issued by a judge, or was it an
9  agreement between you and your wife
10 confirmed by a judge?
11 A.  We settled it.
12 Q.  Okay.
13 A.  It was settled.
14 Q.  When was the divorce filed?
15 MR. PARNELL:  When was the case
16 filed?
17 Q.  Yeah, when was it --
18 A.  I filed in February of '01.
19 MS. DePAOLA:  That was in
20 Colorado; right?
21 Q.  February of '01?
22 MS. DePAOLA:  There were two
23 proceedings.

Page 49

1   MR. PARNELL: I think the
2   proceeding here was in
3   January, but I'm not sure
4   about that, Von. Do you
5   remember when Starla filed
6   her case?
7   THE WITNESS: Yeah. She filed
8   right before I did, but I got
9   her served first so it was
10  just back and forth.
11  Q.  Oh, I think I'm understanding now. You
12  filed in Montgomery County --
13  A.  No, no. I filed in Colorado.
14  Q.  You filed in Colorado? Where did she file?
15  A.  She filed in Alabama.
16  Q.  In Montgomery?
17  A.  That's -- that's what happened.
18  Q.  And Sawyer represented which individual?
19  A.  I don't know a Sawyer.
20  Q.  I think there was a Sawyer over here a
21  block over that I've heard mentioned from
22  time to time; can't think of his name right
23  now.

Page 50

1   A.  I don't recognize that --
2   Q.  Was he involved in the divorce?
3   MR. PARNELL: John Olszewski
4   represented Starla, in Floyd
5   Minor's office.
6   Q.  And who represented you?
7   A.  In Colorado or Montgomery?
8   Q.  Either place -- both.
9   A.  Randy Klauzer in Colorado and Wanda
10  Deveraux in Montgomery.
11  Q.  But the divorce decree was issued from --
12  the divorce decree came out of Montgomery
13  County; right?
14  A.  Right.
15  MR. MEMORY: Off the record.
16      (Off-the-record discussion.)
17  EXAMINATION
18  BY MS. DePAOLA:
19  Q.  Sir, Mr. Price, when was the lawsuit first
20  filed by Great Plains?
21  A.  It would be in this file right here.
22  Q.  I mean, I know they attached the money in
23  September right before the auction, but

Page 51

1   when was the complaint first filed? I just
2   want your --
3   A.  I don't know. I'm looking. Is this it?
4   Q.  No. I don't have the date on the original
5   complaint.
6       (Off-the-record discussion.)
7   MR. PARNELL: Do you know?
8   THE WITNESS: I think it was prior
9   to the auction. Or may --
10  it's got to be documented
11  here somewhere. Doesn't this
12  have to be signed?
13  MR. PARNELL: There's an
14  affidavit, signed on
15  September 26th.
16  THE WITNESS: Here's
17  September 24th right here,
18  '01.
19  Q.  And those are in conjunction with the
20  attachment of the funds. My question was
21  when was the original complaint against you
22  filed, not the funds attached, but the
23  original complaint.

Page 52

1   A.  Is this not what I'm looking at?
2   MR. PARNELL: If you don't know,
3   say --
4   A.  I don't know.
5   Q.  All right. Prior to the complaint being
6   filed, I take it that you had been notified
7   by the defendant that they believe there
8   was some money due and owing to them; is
9   that correct?
10  MR. PARNELL: Did you get a
11  default letter or something
12  demanding payment or
13  something like that? That's
14  what she's asking.
15  A.  No.
16  Q.  In their complaint, they say plaintiff,
17  that's Great Plains, has notified
18  defendant, Cross Country, Price, and Starla
19  Price, that defendant, Cross Country, is in
20  violation of its factoring agreement and
21  has demanded repayment to no avail. Did
22  you -- let me ask you again, did you
23  receive any notice of them that you were

Page 53

1  behind on your payments before this one?
2  A.  No, none.
3  Q.  None? So this was a shock when this
4  lawsuit --
5  A.  Yes. Yes.
6  Q.  That's all I have, Von.
7  MR. MEMORY: Can we adjourn, Nick?
8  MR. PARNELL: Sure.
9  MR. MEMORY: Then we'll get back
10 together.
11
12
13 (The deposition of STEPHEN PRICE,
14  concluded at approximately 5:51 p.m., on
15  October 2nd, 2002.)

Page 54

1       * * * * * * * *
2       REPORTER'S CERTIFICATE
3       * * * * * * * *
4
5  STATE OF ALABAMA
6  COUNTY OF MONTGOMERY
7
8       I, Nicole Paulk, Court Reporter
9  and Notary Public in and for the State of
10 Alabama at Large, do hereby certify that on
11 October 2nd, 2002, pursuant to notice and
12 stipulation, I reported the deposition of
13 STEPHEN PRICE, who was first duly sworn by
14 me to speak the truth, the whole truth, and
15 nothing but the truth, in the matter of
16 STEPHEN L. PRICE, Debtor, Case No.
17 01-05335, now pending in the United States
18 Bankruptcy Court, Middle District of
19 Alabama, that the foregoing 53 typewritten
20 pages contain a true and accurate
21 transcription of the examination of said
22 witness by counsel for the parties set out
23 herein; that the reading and signing of

Page 55

1  said deposition was waived by witness and
2  counsel for the parties.
3       I further certify that I am
4  neither of kin nor of counsel to the
5  parties to said cause, nor in any manner
6  interested in the results thereof.
7       This 17th day of October, 2002
8
9
10
11      Nicole Paulk
        Reporter and Notary Public
12      State of Alabama at Large
13